# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

ADRIAN GEORGE CAMACHO,
Defendant and Appellant.

S141080

San Diego County Superior Court
SCN 163535

November 28, 2022

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Jenkins, and Guerrero concurred.

PEOPLE v. CAMACHO

S141080


Opinion of the Court by Cantil-Sakauye, C. J.


At approximately 5:05 p.m. on June 13, 2003, uniformed Officer Tony Zeppetella of the Oceanside Police Department detained defendant Adrian Camacho in a traffic stop. By 5:09 p.m., defendant had shot the officer no fewer than 13 times, beaten him as he laid wounded but conscious on the ground, and fled the scene. Despite receiving immediate medical attention, Officer Zeppetella died en route to the hospital.

At trial, defendant did not contest that he shot and killed Officer Zeppetella. He claimed, however, that he did so during a period of delirium and psychosis brought about by a combination of illicit substances and prescription medication he had ingested. Defendant argued that, due to the effects of the drugs, he did not possess the requisite mental state for first degree murder. (Pen. Code, § 187, subd. (a); all further unspecified statutory references are to the Penal Code.) Defendant urged the jury to convict him of a lesser crime, one as lenient as involuntary manslaughter, but in any event not more severe than second degree murder.

The jury rejected defendant's argument, finding him guilty of first degree murder. (§ 189, subd. (a).) It also found true two special circumstance allegations: (1) defendant murdered Officer Zeppetella "for the purpose of avoiding or preventing a lawful arrest" (§ 190.2, subd. (a)(5)), and (2) defendant "knew, or reasonably should have known, that the victim was a peace officer engaged in the performance of his or

her duties" and intentionally killed Officer Zeppetella while he was engaged in the performance of said duties (§ 190.2, subd. (a)(7)). The jury further found true the allegations that defendant "personally use[d] a firearm" and "personally and intentionally discharge[d] a firearm and proximately cause[d] great bodily injury" in committing the murder. (§ 12022.5, subd. (a); § 12022.53, subd. (d).) Finally, the jury convicted defendant of being a felon in possession of a firearm and possessing a controlled substance for sale.

At the conclusion of the penalty phase, the jury recommended a sentence of death. The court so sentenced defendant.

This is defendant's automatic appeal. We affirm the judgment in its entirety.

## I. BACKGROUND

### A. Evidence at the Guilt Phase

#### 1. Prosecution case

##### a. Events at the scene of the shooting

The shooting and killing of Officer Zeppetella occurred on a Friday afternoon in the parking lot of a Navy Federal Credit Union in Oceanside. Because that Friday was payday at a military base located close by, the credit union was busy and multiple witnesses observed and testified to the events surrounding the shooting.

Eyewitnesses testified to seeing a person later identified as defendant driving a blue Toyota. Officer Zeppetella's police vehicle had pulled into the credit union's parking lot behind the Toyota, partially blocking it. The officer then walked up to defendant, seated in the Toyota. Defendant handed the officer

some sort of paperwork. The witnesses testified that the interaction seemed routine.

As the officer half turned away from defendant with the paperwork, however, defendant opened fire. Subsequent expert testimony established that defendant fired his Ruger pistol, hitting Officer Zeppetella multiple times. After a pause, defendant and the officer began to exchange gunfire, and the officer hit defendant once in the knee.

Laura Pallos observed the incident unfolding from her vehicle. She testified that after hearing the initial gunshots, she saw an officer "stumbling . . . out from between two cars." She then saw "a man," defendant, "come out . . . from between those same two cars with a gun pointing at the officer" and "shooting at him." After falling to the ground, Officer Zeppetella began "pulling himself along with his right arm." It appeared to Pallos that Officer Zeppetella was "looking for some place to crawl behind." Defendant "watch[ed] very intently" before "following" Officer Zeppetella, "taking the shortest path towards the officer." Having covered the distance to the victim, defendant "reached down," "grabbed the back of the police officer's collar," "pulled him up," then swung down with the gun held in his right arm, striking the officer on the back of the head three or four times. Defendant subsequently threw the officer "down to the asphalt."

Pallos testified that she saw defendant then "crouch[] down" by the officer and press "at his waist line with both hands." Testimony by other witnesses indicated that defendant had emptied his own firearm at this point, but that he found and seized Officer Zeppetella's Glock handgun, presumably when Pallos saw defendant crouched by the officer. Pallos then saw

defendant backing away while maintaining focus on the officer "at all times." When defendant saw movement from the officer, he "stepped back in those two steps that he had backed up and shot him again" — this time with the officer's own handgun — "three, four" more times. "The officer stopped moving." Defendant watched the victim for a second longer, then got into the police vehicle and sped away from the scene.

Corpsman Gabriel Tellez, who specialized in "combat and combat-related trauma," was inside the credit union during the shooting. Once the shooting ceased, Tellez made his way to the parking lot and "noticed [an] officer laying on the ground face down." Based on the color and amount of the blood that "had already pooled underneath the officer," Tellez recognized that Officer Zeppetella had "a very life threatening injury." "Working as quickly as [he] possibly c[ould]," Tellez rolled the officer onto his back, got his ballistic vest off him, ascertained that blood was pulsing from a wound in his chest, and inserted his fingers into the wound to clamp off the severed artery that was bleeding. Officer Zeppetella was still alive and responsive at this stage, as he "winced in pain" when Tellez inserted his fingers in the wound. Other bystanders joined Tellez in rendering aid. An ambulance arrived. The paramedics loaded Officer Zeppetella and Tellez, whose fingers were still inside the officer's chest maintaining "a critical hold," into the ambulance. Although the paramedics continued to provide medical care during the ambulance ride, Tellez noticed "life [was] starting to ebb out of Officer Zeppetella." The officer was pronounced dead at Palomar Hospital slightly more than an hour after the shooting began.

### b. *Events following the shooting*

After defendant fled the scene in Officer Zeppetella's patrol vehicle, he drove to a neighborhood where he had previously resided with his mother-in-law, Lorraine Camacho.[1] Lorraine lived at a house on Via Isidro, and an eyewitness saw defendant on foot and turning onto the street. The eyewitness, together with another individual, Doug Cosley, discovered a police car abandoned a short distance away from Via Isidro with the engine still running. The witnesses then heard through a radio transmitting from the vehicle that "there was an officer down and a car and weapons missing." Thinking that the missing police vehicle was the one they were standing next to, Cosley used the radio to report the car's location.

Police officers arrived soon after and followed what appeared to be blood stains leading to Lorraine's residence. Surmising that defendant had isolated himself inside, law enforcement personnel spent the next few hours securing the area and evacuating nearby residents. By approximately 9:00 p.m., a SWAT team led by Sergeant Thomas Aguigui was ready to make contact with defendant.

Aguigui testified that he communicated with defendant via a bullhorn. After Aguigui established rapport, defendant told the sergeant that he was scared, he had cut his wrists, and he did not want to come out of the house for fear of the police. Defendant also asked if "the officer died," to which Aguigui replied that he did not know. Aguigui reassured defendant that "it was safe for him to come out" and that "medical attention

---

[1] We refer to people who share a surname with defendant by their first names to avoid confusion.

[would be given] to his injuries." Defendant agreed to exit the residence. Defendant then followed Aguigui's directions, turned on the porch light, stepped out, dropped a piece of cloth that he had in his hand when directed to do so, and walked to the officers. After the SWAT team placed handcuffs on defendant, he was turned over to medics for first aid. When he was on the gurney, defendant volunteered that he did not " 'know what that officer did to make [him] snap.' " Based on his interaction with defendant, Aguigui testified that although defendant was "in some significant amount of pain," he was "coherent" and able to understand the instructions given to him.

Aguigui's observations of defendant's demeanor were echoed by medical personnel who treated defendant that night. Timothy Huerta, one of the paramedics who transported defendant to the hospital, testified he and his partner undertook an initial assessment of defendant at 9:41 p.m. after defendant walked out of the house on Via Isidro. Defendant was "alert," "cooperative," able to relay date, time, and location as well as "his age, his weight, whether or not he was in pain, which he said he wasn't, and where he had been shot." In communicating all this information, defendant's speech was "normal and clear." Once the paramedics placed defendant into the ambulance, they began standard treatment procedure for a patient with a gunshot wound, bandaging his injuries, establishing an IV, and placing him on oxygen. Defendant remained "very alert," "looking around" and "watching [the paramedics'] movements."

Once defendant arrived at the hospital, Dr. Imad Dandan treated him at 11:00 p.m. Dandan's assessment was that defendant was "awake and alert." He talked to defendant, who was "calm, very courteous, and responsive to . . . questions." Defendant did not have pressured or rapid speech; he was not

incoherent; he did not sweat excessively; and his temperature was normal. Defendant did have lacerations on both of his forearms, three on the left and one on the right. The lacerations were "a little jagged and superficial," measuring from two centimeters to four centimeters. Dandan administered local anesthesia, "cleaned the wounds and repaired them." Defendant also had a gunshot wound on his right knee. Dandan cleaned the wound and gave defendant antibiotics but did not remove the bullet because there was "no danger [from] leaving the bullet [in]" and removal would result in more damage.

A nurse drew defendant's blood at around 11:00 p.m., the same time as Dr. Dandan's examination. Toxicologist John Treuting reported the results of the tests done on the sample extracted. According to Treuting, defendant tested "positive for methamphetamine at a qualitative level of 119 nanograms per millimeter of blood." This was a level that Treuting would consider "toxic."

In addition to methamphetamine, defendant's blood also contained "morphine at a level of 576 nanograms per ml and a codeine level of 98 nanograms per ml." Morphine is a byproduct of heroin, while the presence of codeine could be explained both by an individual using codeine or by the individual "converting morphine to heroin." Again, Treuting would consider this level of morphine "toxic."

Treuting further testified that defendant tested positive for Valium and Paxil at levels that were within the therapeutic

range.[2]  Based on the levels present in defendant's blood alone, however, it was difficult for Treuting to conclude when defendant had ingested the various illicit drugs or what the drug concentrations were at a point in time prior to the blood sample being taken.

At approximately the time that defendant was receiving medical care, police officers conducted a search of Lorraine's house on Via Isidro.  Defendant had evidently broken into the house[3] by shattering a rear glass door.  Inside one of the bathrooms, there was writing on the walls in what appeared to be blood.  One of the writings said, "I," followed by a picture of a heart, and "my wife and kids."  Two others read, "sorry" and "I'm sorry."  Yet another writing read, "Help me, Ordas."  As will be detailed below, Ordas is the name of a psychiatrist who had been treating defendant.

In the same bathroom were various drug paraphernalia.  In the toilet was "a small ziploc baggie with brown residue."  There was also a glass pipe with white residue and a bag with "squares cut out of it."  Karen Laser, a corporal with the Oceanside Police Department and the person who discovered the items, testified that the brown baggie contained heroin, the

---

[2]  Valium, the brand name for diazepam, is an antianxiety drug.  Paxil, the brand name for paroxetine, is an antidepressant.  Treuting described the "therapeutic range" as indicating a dosage at which an individual taking the drug is "getting the beneficial effects and not the toxic effects or the adverse effects."

[3]  Lorraine Camacho, who still resided at the location, happened not to be home.

glass pipe contained methamphetamine, and the bag appeared to be used to package tar heroin.[4]

Marilyn Priem, a detective with the Oceanside Police Department, searched one of the bedrooms in the house. Priem saw a vacuum cleaner inside a closet and detected a hard object inside the vacuum bag. Believing the object to have been too large for a vacuum cleaner to have naturally suctioned up, Priem "unzipped the outer portion of the bag" and saw that the inner dust collection bag had been either torn or cut open. Inside was a magazine containing bullets, next to which was "the back end of a . . . Glock 17 gun." Priem believed that both the magazine and gun were "placed very carefully" rather than "thrown in" the vacuum bag because "they were almost level with [each other and had] almost the same amount of dust surrounding [them]." After these two items were removed, police personnel discovered a Ruger pistol inside the same vacuum bag.

Officers also searched the blue Toyota that defendant had been driving when he was stopped by Officer Zeppetella. John Morgans, an investigator for the Oceanside Police Department, processed the vehicle. Of relevance, Morgans recounted that he found a blue nylon bag on the front passenger seat. Inside the

---

[4] The items were sent for chemical testing. Although laboratory work confirmed that the glass pipe contained methamphetamine, it could not detect heroin from the baggie. The criminalist who testified concerning the results explained that heroin is "highly soluble" in water. As such, if a bindle containing heroin was left in a toilet sometime between "5:00 in the afternoon and 9:15 to 9:30 at night" and the bindle was not recovered "out of the toilet until sometime after 4 or 5 o'clock the next morning," that could have "an impact on [the] ability to detect . . . heroin."

bag were "tweezers, scissors, small jeweler's bags, which are used to package narcotics," "small cotton swabs that are generally used to dip into a substance that's been heated up to inject," small plastic and metal spoons, two syringes, "a small little ziploc bag that contained . . . some residue," and small glass vials, again, with residue. Morgans also testified that he found a cell phone.

Finally, officers searched the house that defendant shared with his wife, Stacey Camacho. Christopher Carnahan, another Oceanside police officer, testified that both drug paraphernalia and ammunition were found in the house. The police uncovered plastic bags containing substances that looked like marijuana, methamphetamine, and heroin, as well as spoons and pills.[5] Carnahan was "an experienced narcotics detective," and he testified that the narcotics recovered from the Toyota and the house were possessed not for "simple use" but for sale.

### c. Expert testimony at trial

The prosecution in its case in chief presented various experts, including that of a medical examiner and a crime scene reconstruction expert. The medical examiner, Dr. Bethann Schaber, performed an autopsy on Officer Zeppetella's body "to determine the cause and manner of [his] death" and testified as follows.

Officer Zeppetella suffered 13 "penetrating and perforating gunshot wounds."[6] Of these, two were fatal. The

---

[5] Many of the items seized from the house were sent to a laboratory for testing and tested positive for heroin.

[6] There appears to have been two additional shots that grazed the officer but did not enter his body.

first fatal shot entered the victim's chest, "traveled from front to back," and remained lodged in his neck and back. In moving through the body, the bullet fractured the clavicle and perforated the "right internal jugular vein and the right common carotid artery," "two large blood vessels supplying the head." The second fatal shot entered the officer's back. "The bullet travel[ed] through the body, perforating fat around the kidney, perforating the diaphragm or the muscle between the chest and abdominal cavity that allows people to breath. It then perforate[d] the spleen and is lodged in the . . . chest below the nipple."

In addition to these injuries, Officer Zeppetella sustained gunshot wounds to the neck, back, left arm, right arm, right elbow, right hand, right thumb and wrist,[7] thigh, and buttock. He also sustained "four separate lacerations or tears in the scalp resulting from blunt force injury." These injuries were consistent with Pallos's testimony that defendant struck the officer in the head with defendant's gun.

The crime scene reconstruction expert, Rodney Englert, related his opinion based on reports by others, his own examination of the physical evidence, and a synthesis of eyewitnesses' accounts. Although Englert was not able to pinpoint the exact sequence of shots, he was able to reconstruct the following details regarding the shooting. Defendant fired 16 shots from his Ruger pistol, emptying the gun; of these,

---

[7] Other testimony indicated that Officer Zeppetella held his firearm in his right hand. The bullet that entered his right arm fractured the officer's humerus, the bone connecting his shoulder to the elbow. The bullet through the thumb fractured the ulna, one of the two bones in the wrist.

11 struck Officer Zeppetella. Officer Zeppetella, in turn, discharged his gun 14 times, hitting defendant once. In the initial volley of shots, defendant fired his gun five times, hitting the officer in the chest, neck, and right thumb and wrist. Defendant fired the first fatal shot — the one that entered the officer's chest — in this burst of gunfire. During the subsequent exchange of gunfire (when the officer had begun firing back), defendant hit the officer another eight times, breaking his shooting arm. After Officer Zeppetella attempted to crawl away, defendant beat the officer, causing the head wounds observed by the medical examiner. Defendant then seized Officer Zeppetella's Glock handgun and shot at him another four times, emptying this firearm as well. One of these shots was the fatal shot that entered through the officer's back and perforated his diaphragm and spleen.

### 2. *Defense case*

#### a. *Testimony regarding defendant's behavior prior to the shooting*

At trial, defendant argued that he suffered from a diminished mental state at the time of the shooting due to his use of drugs. To support his case, defendant introduced the testimony of his wife, coworkers, and neighbor — witnesses who recounted defendant's addiction to heroin and his behavior prior to the shooting.

Defendant's wife, Stacey Camacho, testified that she had known her husband for about ten years. Defendant was addicted to heroin that entire time. Sometime in March or April of 2002, Stacey arranged for defendant to begin seeing a psychiatrist, Dr. Dennis Ordas. From 2002 to 2003, defendant's health was deteriorating. He "was going to rehab" and

"methadone clinics." At some point after he began seeing Dr. Ordas, defendant was hospitalized at Aurora Hospital, "a behavioral health center." There he was prescribed Paxil, which he continued to take until the day of the shooting. Between May 2002 and June 2003, defendant was hospitalized "five or six times." According to Stacey, defendant was "suicidal," "had been very depressed for a while," and "was trying to stay off drugs," but "he said he couldn't handle it anymore."

Defense counsel also questioned Stacey concerning whether there were "any times . . . when [defendant] exhibited bizarre behavior [toward her]." Stacey answered affirmatively and volunteered as examples the fact that defendant "would hear voices that nobody else would hear" and "he always thought that people were coming to the door, so he constantly was staring [out] the window." When asked if "there [was] a time when he thought suspicious[ly]" of her, Stacey responded that sometimes when she "wore a headband," defendant "would grab it" and "cut it up" or tell her that she had "wires in [her] headbands" and was "trying to watch him." Likewise, defendant "thought [she] had hidden cameras in" her platform shoes.[8]

Regarding the shooting, Stacey told the jury that defendant called her at work sometime after 5:00 p.m. on June 13, 2003. Defendant sounded "real scared" and "hysterical." He said "he was at [her] mom's house and that a police officer was hurt, and he wanted to die." On direct examination, Stacey testified that defendant did not tell her

---

[8] Due to the phrasing of defense counsel's questions ("were there any times" "was there a time"), it is difficult to ascertain when defendant "exhibited [the] bizarre behavior" Stacey recounted.

"how or why or what happened to the police officer," that he did not tell her that "he shot a police officer and a police officer shot him," but merely that "he hurt a police officer." After speaking to defendant, Stacey called her mother, Lorraine Camacho, relating that defendant was "at her house," "really upset," and that she (Lorraine) needed "to go home."

Stacey also left work and drove to Lorraine's home. She thought defendant "was going to kill himself." Stacey cooperated with law enforcement personnel she encountered around her mother's residence. After defendant surrendered and received medical care, Stacey was able to talk to him at the Oceanside police station. In contrast to the medical personnel's observations, Stacey thought her husband was far from coherent or "clear headed" — "he was mumbling things," "wasn't making any sense," "was crying," and still saying that "he wants to die."

On cross-examination, Stacey agreed with the prosecutor's description of her conversation with her mother, some of which was inconsistent with her testimony on direct examination. For instance, the prosecutor asked if Stacey told her mother "words to the effect of, you know, the defendant called me — or whatever words you used — and he got scared and he shot a cop, and the cop shot him and you know — and he took off, words to that effect to your mother." Stacey responded, "right."

Lorraine Camacho corroborated parts of Stacey's testimony. Lorraine stated that Stacey called her on the afternoon in question and "was very hysterical" and "crying." After speaking to Stacey, Lorraine immediately went home. Like Stacey, Lorraine encountered law enforcement surrounding her home and cooperated with them.

When questioned by the prosecution, Lorraine admitted that she had given statements to the police that either conflicted with certain details in her daughter's testimony or tended to incriminate defendant. For example, Lorraine stated Stacey told her that, during the telephone conversations she (Stacey) had with defendant, defendant told her, "I was speeding," "got pulled over in a traffic stop," and "got scared." Furthermore, "the essence" of what defendant told Stacey, as Stacey related to Lorraine, was that defendant "got scared, shot a cop, [and] a cop shot him in the leg." Although at trial Lorraine asserted she did not remember saying so, in an audiotaped statement to the police Lorraine had recounted that defendant told Stacey "he shot a cop, and he got shot in the leg, and he — he went to your house cause that's the only place he could think of to hide because it was right around there — or words to that effect."

The defense also called to the stand two of defendant's coworkers, David Bates and Lonnie Roybal, and a neighbor, Walter Priest. Bates testified that other employees told him defendant had a drug problem. Bates also stated that approximately a month before the shooting defendant stopped showing up to work at his construction job. Defendant's other coworker, Roybal, testified that he knew about defendant's drug problem both because defendant confided to him about that, and because Roybal observed behavior from defendant such as "nodding out in the mornings."

Walter Priest, who lived in the same mobile home complex as defendant and Stacey, testified that he saw defendant driving by between 2:30 and 3:00 p.m. on the day of the shooting. Priest thought defendant's behavior was unusual because he "stared a lot," looked like he was suspicious, and did not offer a "friendly neighbor wave."

In response to Stacey's testimony, the prosecution called California Highway Patrol Officer William Grant. Grant had assisted with directing traffic around Lorraine's house on the day of the shooting. When Stacey attempted to reach defendant by driving to the residence, Grant stopped her, because no traffic was allowed in or out of the area. Grant recounted that when he talked to Stacey, she volunteered her husband had conveyed that he shot a police officer, "that he wasn't going to go back to prison and that he was going to kill himself."

### b. *Expert testimony at trial*

In addition to the lay witnesses, the defense introduced the testimony of two experts, psychiatrists Dennis Ordas and Pablo Stewart. Ordas maintained a private practice and worked at the Vista Detention Facility. Defendant had been one of Ordas's patients at his private clinic for about a year by the time of Officer Zeppetella's shooting. When Stacey first brought defendant to Ordas in April 2002, defendant was addicted to heroin and wanted help. During the next year, Ordas saw defendant about 18 times. Defendant "struggle[d]" with his addiction, trying to quit and relapsing, with "his longest clean period [being] about ten days."

On March 18, 2003, Dr. Ordas received a telephone message from defendant. The message, as taken down by the doctor's secretary, said, " 'Please call. Hearing buzzing in head.' " Ordas called defendant and scheduled an appointment for two days later. When Ordas saw defendant at the appointment, defendant told him that he had been "living on the streets for a few weeks." Defendant also conveyed that he "was back to using more heroin, and he had actually done a small amount of crystal meth."

On June 13, 2003, Dr. Ordas received telephone calls from Stacey and law enforcement. Both informed him about the events of the shooting, that defendant "was holed up in a house, and [the Oceanside Police Department] wanted to see if [Ordas] would attempt to talk him out of the house." Ordas declined. However, because of his work at the jail, Ordas did see defendant the next day. Ordas's impression was that defendant was "mentally beat up" and suffering from "confusion about what had just happened." Defendant himself told the doctor that he was " 'out of it.' "

When defendant was held at the jail, Dr. Ordas oversaw his mental health care. Ordas believed defendant was experiencing "traumatic recalls or intrusive thoughts" about the events surrounding the shooting. Defendant reported having nightmares, and Ordas prescribed him medications to help with his anxiety, inability to sleep, and nightmares.

To lay groundwork for later testimony by Dr. Stewart, the defense asked Dr. Ordas about methamphetamine-induced psychosis. Ordas confirmed that such a condition is listed in the Diagnostic and Statistical Manual of Mental Disorders and gave a description of the condition. The defense then inquired about the chemical makeup of Paxil and if "it might be similar to methamphetamine." Ordas responded "no," but that "[t]here is some literature that suggests that Paxil and methamphetamine may compete at a similar receptor site in the liver."

The defense also explored with Dr. Ordas defendant's use of Paxil. Ordas confirmed that defendant was prescribed the medication during his visit at Aurora Hospital in 2002 and Ordas "continued it [the prescription] when [defendant] came to see me." In fact, Ordas increased the dosage of the medication

to treat defendant's depression.  On March 20, 2003 — the date when defendant told Ordas that he was using methamphetamine — Ordas prescribed defendant Paxil, keeping the dosage of the drug the same but changing the formulation of the medicine to "sustained release" so that the active chemical released "throughout the day" instead of in "one solid hit."

Picking up on the topic of Paxil and methamphetamine, the prosecution solicited from Dr. Ordas the view that he was "comfortable giving the Paxil knowing [defendant] was taking some meth with his heroin."  Ordas further volunteered that such treatment is "fairly common."

The prosecution inquired about the diagnoses that Dr. Ordas made of defendant based on his provision of care when defendant was in the jail.  Ordas stated he diagnosed defendant with heroin dependence, methamphetamine dependence, depression, and antisocial personality disorder.  The prosecution verified that Ordas was not expressing an opinion that defendant had a "methamphetamine-induced psychotic episode on June 13th, 2003."  Ordas responded, "I would not be qualified to say that.  I wasn't there."

The defense's principal expert was a psychiatrist, Dr. Stewart, who, unlike Dr. Ordas, did opine that defendant had methamphetamine-induced psychosis during the shooting of Officer Zeppetella.  In arriving at his diagnosis, Stewart reviewed defendant's medical records, interviewed his family members, and talked to defendant.  Stewart diagnosed defendant with heroin and methamphetamine abuse.  He noted that these diagnoses were the same diagnoses defendant received at Aurora Hospital in 2002.  Stewart further noted that

defendant was prescribed Paxil by the staff at Aurora Hospital and that in March 2003 he was transitioned to a controlled release form of Paxil. In Stewart's opinion, being on a controlled release form of Paxil was comparable to receiving an increased dosage of the drug because the drug would stay in the body for longer.

In addition to the above diagnosis, Dr. Stewart opined that in June 2003 defendant suffered from two other mental disorders: (1) substance intoxication delirium, with the relevant substances being "the mixture of methamphetamine and Paxil, and . . . a contribution from the heroin," and (2) methamphetamine-induced psychotic disorder. Regarding the first diagnosis, Stewart explained that delirium is like "a short-lived dementia." A delirious person "may not be fully aware of [the environment]," or "fully cognizant of things going on," and may have "memory problems" and "perceptual disturbances where [the person is] misinterpreting the intentions and . . . behavior of others." Such delirium is "short lived" and may "wax and wane." Substance intoxication delirium means that the delirium is "related to the use of substances," in this case "methamphetamine and the antidepressant Paxil."

Dr. Stewart supported his diagnosis by explaining the biochemistry of the substances involved, followed by observations about defendant's behavior. Regarding the biochemistry of Paxil and methamphetamine, Stewart explained that Paxil works in the body "basically the same [way] . . . methamphetamine works." This means that "one drug Paxil plus one drug methamphetamine doesn't equal two"; instead, the effect of the drugs is "multiplied so [the individual] get[s] a much greater effect from the mixing of these two drugs." In

19

addition, an enzyme in the liver, called 2D6, which metabolizes methamphetamine, is inhibited by Paxil.  This results in the body "seeing more methamphetamine."  Having both Paxil and methamphetamine in the system brings about "changes of consciousness, [and] cognitive problems" or substance intoxication delirium.

Such delirium, Dr. Stewart testified, "overlap[s]" with his second diagnosis — that defendant was experiencing methamphetamine-induced psychotic disorder.  A person suffering from this disorder has "psychotic symptoms, hallucinations or delusions, . . . that are temporally related to the use of the substance."  Examples of psychotic symptoms are "auditory, [or] visual hallucinations" and "paranoid delusions."  Stewart identified the following as evidence that defendant was experiencing psychotic symptoms:  the "buzzing in his head" as reported to Dr. Ordas; defendant's belief, as related by Stacey Camacho, that Stacey had cameras in her platform shoes and wires in her headband; and Stacey's testimony that defendant was hearing people coming up to his door "when in fact they really weren't."

Turning to the events on the day of the shooting, Dr. Stewart opined that defendant's behavior corresponded to his "having both of these conditions" and exhibiting "clouded consciousness, cognitive problems, [and] perceptual disturbances" during the encounter with Officer Zeppetella.  Stewart characterized the shooting as a "bizarre killing" that occurred in the middle of the afternoon, when it was "bright out" and there were "a lot of people around."  In Stewart's opinion, defendant displayed a "lack of . . . awareness of all these witnesses that were around him" and engaged in a "single-minded" act of shooting the officer.  Moreover, defendant acted

"odd[ly]" in stealing the police car when "there were plenty of . . . civilian vehicles that were readily available to him if in fact he was choosing to [escape]."

When asked if delirium and psychosis due to intoxication were consistent with witnesses' testimony regarding defendant's conduct preceding and following the shooting, Dr. Stewart answered affirmatively. For example, defense counsel asked, "when the police removed [defendant] from the home [of Lorraine Camacho], he said he blacked out and didn't know what the officer did to set him off, and he wanted to kill himself . . . are those statements consistent or inconsistent with . . . the diagnoses you've described?" Stewart responded, "You certainly can see types of behavior like that, given these particular diagnoses that we've been discussing today."

Anticipating the prosecution's questions, defense counsel queried if some of defendant's seemingly purposeful behavior was consistent with delirium and psychosis. Dr. Stewart replied that due to the fluctuating nature of the conditions, defendant "could have moments of lucidity followed by moments of confusion." Moreover, "[t]hings that appear to be purposeful" (i.e., that defendant "gets in the police car," "drives away," "gets weapons and puts them in a vacuum cleaner bag") do not "rule out the presence of a delirium diagnosis" because one "can't tell [delirium] from just looking at the behavior."

The prosecution cross-examined Dr. Stewart at length, focusing on the fact that there were "between 16 and 17,000 pages" of documents in the case, out of which Stewart reviewed only 20 items. Those 20 items were provided to Stewart by the defense, and Stewart did not request any additional documents. In particular, Stewart did not review statements given to the

police by Lorraine Camacho; he did not read letters that defendant wrote while he was in jail even though Stewart had testified in a prior matter that "the writings of the person who [he] was assessing" were important; and he did not write a report documenting his opinion despite having done so in prior cases and knowing that "when [he has written such reports, he was] cross-examined on the contents of the report."

The prosecutor also questioned the basis of Dr. Stewart's opinion concerning biochemistry and the effect of combining Paxil and methamphetamine. Stewart had produced to the prosecution the abstracts of about two dozen articles, identified as the sources on which he based his opinion. The prosecutor asked, and Stewart agreed, that none of the articles concerned Paxil, methamphetamine, and their effects on human beings. Focusing on the one abstract documenting the function of the enzyme 2D6 that Stewart had testified is inhibited by Paxil, the prosecutor first elicited an acknowledgment that the article was "one of the main" articles "supporting [Stewart's] theory about what happened in this case." The prosecutor then elicited from Stewart the concession that he had not actually read the article, but only the abstract. Furthermore, Stewart could not recall whether the article had concluded that the increase in concentration of a key chemical because of 2D6 inhibition was "small." Likewise, Stewart did not remember whether the article had concluded that there were "parallel enzymes" that could help to metabolize chemicals when 2D6 was inhibited.

Of the letters that the prosecution mentioned to Dr. Stewart, two were introduced into evidence at trial. Defendant had written these letters when he was in custody facing charges in the present case. As part of its attempt to rebut the defense theory that defendant's shooting and killing of

Officer Zeppetella was explained by drugs and no other motives or factors, the prosecutor used the letters to argue that defendant harbored animus toward law enforcement.

To further rebut Dr. Stewart's testimony, the prosecution called its own expert, Dr. Daryl Matthews, a board-certified forensic psychiatrist. Matthews stated that he had prepared a written report laying out his opinion concerning this case. He confirmed that in connection with the preparation of the report, he received from the prosecution 16 to 17,000 pages of documents. He further articulated that if the prosecution had "pick[ed] and cho[]se[n] among the material that [it] sent him," his work would have been compromised and he would have insisted that the prosecution give him the entire corpus of materials.

Dr. Matthews stated that on June 13, 2003, defendant suffered opioid dependence and antisocial personality disorder. In exploring Dr. Matthews's opinion, the prosecutor asked a series of leading questions to conform the doctor's testimony to the parameters the trial court had imposed, which limited discussion of hearsay information the doctor relied on in reaching his conclusions. Matthews enumerated the diagnostic criteria for antisocial personality disorder and explained that defendant met those criteria. The most relevant parts of his testimony, however, concerned areas in which he disagreed with Dr. Stewart.

Dr. Matthews briefly reviewed the diagnostic criteria pertaining to delirium, emphasizing that "the essential feature" is a disturbance in consciousness, or a drop in a person's alertness, accompanied by an impairment in attention — specifically "the ability to focus, sustain or shift attention." This

means that a delirious person cannot "pay attention very closely to something, to handle this task, then go do that task, then come back to the original task, [or] to pay long attention to any task."

Next, Dr. Matthews explained that to determine whether defendant experienced delirium or psychosis when he shot Officer Zeppetella, it was important to focus on defendant's behavior "close to the time [of] the incident." Matthews cautioned that the "mental wherewithal for any particular action is not the basis for deciding [whether a person is impaired]"; instead "it's looking at the whole pattern of interactions over a period of time" that allows one to make a diagnosis.

Dr. Matthews then examined defendant's actions on June 13, 2003, and concluded that they showed defendant was not suffering from delirium during the relevant events. For example, in summarizing defendant's interaction with Officer Zeppetella during the traffic stop, Mathews observed that defendant was able to converse with the officer and present some sort of documentation. Such actions require "recognizing that it's a police officer and answering appropriately," appreciating that the documentation "was requested, know[ing] where it is in your car, get[ting] it, [and] giv[ing] it to the [officer]." The shooting itself indicated corresponding mental skills. For instance, defendant's action in taking the officer's gun required "recognizing that you don't have any more bullets, that [the] person is not yet dead, that they need more things to happen to render them that way, making the decision to [obtain the gun], then locating the appropriate object and being able to use it properly." Matthews also placed significance on defendant's action in fleeing the scene, observing that the

conduct implicated "the recognition that . . . he needed to get away, . . . and then to recognize that there are better ways of fleeing than just running, and recognizing that the car he brought wasn't available to him because it was blocked, and then understanding that he could get away using the police vehicle, getting into a strange vehicle, . . . operating it in reverse and maneuvering it successfully out of a parking [lot] and into a street." These acts, Matthews continued, "may seem like simple things," but undertaking them "requires visuospatial abilities" and the capacity "to pay attention to where you're going, not just drive randomly into a post or make a wrong turn, but to pick a destination, select it and then get there." Such conduct, he asserted, is not consistent with delirium.

Turning to Dr. Stewart's diagnosis of methamphetamine-induced psychosis, Dr. Matthews stated that defendant did not suffer from any such psychosis. Focusing on defendant's behavior after he reached Lorraine's house, Matthews noted that defendant was able to locate a telephone, call his wife, talk to her, and describe what happened. Likewise, defendant's placement of the guns inside the vacuum cleaner was "significant" because "it involves recognizing that having those things around could get him in serious trouble" and taking "careful steps" to hide the weapons and "avoid being apprehended." When asked about defendant's statements " 'I don't want to go back to prison,' " and " 'I'm going to kill myself,' " Matthews opined that "those are statements made by someone who knows what's going on around him and . . . doesn't have any delusions or false beliefs, doesn't have any difficulty communicating and that reflect normal motivation, normal response, normal recognition of his environment." Addressing the writing in blood on the walls and the fact that defendant cut

his wrists, Matthews admitted using blood was "kind of dramatic" but the writing showed that defendant was able to remember the name of his doctor and write it correctly. Regarding defendant's self-harm, Matthews noted that people with personality disorders — and according to the doctor, defendant had antisocial personality disorder — make such suicide gestures "to bring attention to themselves," "to show how much they're suffering," or "to divert attention from other problems that they've created."

Dr. Matthews gave similar testimony regarding defendant's actions in surrendering and his demeanor as observed by medical personnel. For example, Matthews stated that, unlike defendant, "people who are delirious would not know their surrounding[s] and would not be able to answer questions intelligently and give a good medical history and behave cooperatively. They are prevented from doing that by their diminished level of consciousness and by their inability to pay attention."

On cross-examination, Dr. Matthews was asked if certain behavior "could be evidence of psychotic delusion." The behavior, as described, was "believing someone had wires in their headband that were monitoring your behavior," taking the headband and cutting it up, "believing someone had hidden cameras in their platform shoes that could possibly spy on you," and "hearing foot falls on the steps outside the door, fearing people coming when no one's there." Matthews answered that such conduct was consistent with psychotic thinking. On redirect examination, however, Matthews clarified that such behavior "alone, would [not] mean that you're psychotic."

### 3. Competing theories of the crime

Based on the foregoing evidence, the defense argued that drug intoxication caused defendant's shooting and killing of Officer Zeppetella. The defense emphasized defendant's addiction, his hospitalizations, and the fact that his blood showed "toxic" levels of drugs on the day of the shooting. Relying on Dr. Stewart's testimony, counsel argued that defendant suffered from drug-induced delirium and psychosis during the relevant events. In support, counsel highlighted evidence of such a diagnosis, including Stacey's report of defendant's "psychotic symptoms," Dr. Ordas's observations of defendant's confusion after the shooting, defendant's single-minded and bizarre conduct during the shooting, and his statements afterward. Ultimately, counsel urged the jury not to convict defendant of the more serious crimes — first degree murder, second degree murder, or voluntary manslaughter — because, it was asserted, the prosecution failed to prove beyond a reasonable doubt that defendant, delirious and psychotic, acted with the mental states required for those crimes.

The prosecution, on the other hand, theorized that the killing of Officer Zeppetella constituted a premeditated and deliberate first degree murder that defendant perpetrated to avoid arrest. The prosecution pointed out that defendant had reason to fear arrest because he had drugs and a stolen gun in the car but no driver's license.[9] The prosecution highlighted

---

[9] The parties stipulated that defendant had felony convictions, making him a felon in possession of a firearm. The parties likewise stipulated that the Department of Motor Vehicles had not issued a license under any of the names or aliases defendant used.

details of the crime that, in its view, reflected mental alertness and accurate perceptions of reality that were inconsistent with an altered mental state like delirium or psychosis. For example, the prosecution emphasized defendant's marksmanship, how he was able to hit Officer Zeppetella multiple times, landing both fatal shots and shots that disabled the officer's shooting arm; defendant's ability to divide his attention — to watch the officer to see if he was still moving, and then shift his attention to securing a getaway vehicle; defendant's rational decision to break into Lorraine Camacho's house via a back door because defendant was "much less likely to be seen . . . doing it from the backyard." The prosecution summarized its case as one in which the perpetrator was "a dope-selling, armed, dope user . . . in command of his faculties . . . who gunned down an officer" because he had a "stolen gun, [and] no driver's license."

At the conclusion of the guilt phase, the jury found defendant guilty of first degree murder and found true the special circumstance allegations.

## B. Evidence at the Penalty Phase

### 1. Prosecution case

The prosecution introduced victim impact evidence in the form of testimony from Officer Zeppetella's wife, his father, and a colleague from the Oceanside Police Department.

Detective Marilyn Priem testified that she was Officer Zeppetella's field training officer.[10] From February through March of 2003 — just before Officer Zeppetella began patrolling in his own car — Priem rode with him ten hours a day, four days

---

[10] Priem was the individual who discovered Officer Zeppetella's firearm in a vacuum cleaner.

a week. Priem said the developing police officer was "very caring," "good-hearted," and "compassionate with people." Officer Zeppetella's death left "a big hole in the [Oceanside Police] Department."

Officer Zeppetella's father, Tony Mario Zeppetella ("Mr. Zeppetella"), told the jury of his son's upbringing. Mr. Zeppetella testified that Officer Zeppetella was the youngest of three children and especially close to his mother. Growing up, Officer Zeppetella was a "good kid" and "the joy of [his parents'] life." When contemplating attending college, Officer Zeppetella told his parents he would join the Navy so they would not have to pay for his education. After serving in the Navy, Officer Zeppetella decided to become a police officer because he "wanted to help people." He graduated from the police academy in October 2002. The week before he was killed, he visited his parents and told them he was looking forward to Father's Day, noting that it would be the first that he would be celebrating as a father himself. When Mr. Zeppetella and his wife received news that Officer Zeppetella was killed, "it felt like somebody killed us, also." Officer Zeppetella's mother "lost the will to live" and now "every day, she's at the cemetery."

Officer Zeppetella's widow, Jamie Zeppetella ("Jamie"), testified about the couple's life together. Jamie met him in January 2002. "Within the first week" she knew "he was the person I wanted to spend the rest of my life with." The couple got married in May 2002. In December 2002, shortly after Officer Zeppetella graduated from the police academy, the couple had their son, Jakob. Officer Zeppetella was a "very involved" father, and on the day he was killed, he spent time in the morning with Jakob before heading to work. When Jamie found out later that afternoon that her husband had died, she

"started screaming," "went into . . . a state of shock, and didn't want to talk to anybody." Jamie believed that her husband's death had an impact on six-month old Jakob, who now has to grow up without his father. Jamie believed that her own "goals and hopes" that she had for her family were "gone."

In addition to the victim impact evidence, the parties stipulated defendant had four prior felony convictions. Two involved possession of controlled substances, one involved possession of a firearm by a felon, and the other was for driving in willful or wanton disregard for safety of persons or property while fleeing from a pursuing police officer.

### 2. *Defense case*

The defense's case in mitigation consisted of testimony by defendant's wife, mother, and an emergency room doctor, Karen Van Hoesen. Dr. Van Hoesen told the jury that, based on the medical records she reviewed, defendant's self-inflicted lacerations on his arms were "full thickness" lacerations, or "the most severe" of lacerations. She also testified concerning defendant's blood loss, stating that defendant's hematocrit level, or "the amount of red blood cells . . . in [the] body," was "lower than what is expected to be normal." Finally, Van Hoesen stated that the blood found in the bathtub and scrawled as writing on the wall was "consistent with the blood loss" from defendant's self-inflicted wounds. On cross-examination, Van Hoesen conceded that the description of defendant's lacerations as being "full thickness" was recorded only in the paramedic's report — not the treating physician's (Dr. Dandan's) — and that, in any event, the injuries were not life-threatening.

Diana Gil, defendant's mother, told the jury that defendant was the second of her five children. Defendant spent

the first years of his life with his grandparents at the Daley Ranch in Escondido, where his grandfather worked as a caretaker. Gil confirmed that a picture the defense showed was of her son at the age of 15. Gil pointed out various people (defendant's grandfather, grandmother, and oldest brother) who were in the gallery during her testimony. Finally, Gil said that she was at defendant's trial because she "love[s] [her] son."

Stacey Camacho again testified on her husband's behalf. She related that she and defendant met in 1996 and that they married the next year. They had two children together, Alexis and Anthony, who were six and seven years old. After providing more biographical details, Stacey narrated for the jury a number of pictures showing defendant with herself, Alexis, Anthony, or his coworkers. Like with defendant's mother, defense counsel ended by asking if Stacey still loved defendant. Stacey said she did. She also said that his children still loved him.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. Verdin *error*

##### a. *Background*

Approximately ten months before trial began, the prosecution filed a motion seeking a court order requiring defendant to submit to psychiatric examination by professionals of the People's choosing for the purpose of rebutting defendant's anticipated mental state defense. The trial court denied the request as premature because the defense had not directly placed his mental state at issue. Citing *People v. Danis* (1973) 31 Cal.App.3d 782 (*Danis*), however, the court indicated that if defense counsel "present expert witnesses regarding mental health issues, [the prosecution] is going be entitled to . . . have

your client examined." (See *Danis*, *supra*, 31 Cal.App.3d at p. 786 ["even in the absence of an authorizing statute, a trial court possesses the inherent power to order a defendant who has imposed a defense of insanity or of diminished capacity to submit to an examination of a psychiatrist selected by the People"], disapproved in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096 (*Verdin*).)

In August 2005, after defense counsel indicated that Dr. Stewart would be rendering a medical opinion on defendant's behalf, the court stated that it would sign a "*Danis* order," allowing the prosecution to conduct a psychiatric evaluation of defendant. Defendant objected to the order on statutory and Fifth Amendment grounds. About a month later, defense counsel informed the court that defendant would be refusing to submit to the court's order. Although defendant's attorney told the court that defendant was refusing to comply on the advice of counsel, the court elicited a personal statement from defendant that he was declining to cooperate with an examination. The court accepted defendant's refusal to obey its order but, citing *People v. Carpenter* (1997) 15 Cal.4th 312 (*Carpenter*), told the parties that "the court will be instructing the jury that [defendant] has refused."

During his testimony, Dr. Matthews — the prosecution's forensic psychiatrist — testified that defendant declined an interview with him. Immediately after this statement, Matthews explained the difference between forensic and clinical psychiatry. According to Matthews, forensic psychiatrists do not see "patients" and are not involved in treatment; instead, they perform examinations on "evaluee[s]" with the goal of "learn[ing] enough about the situation so that [they] can be of service in some way to the judicial system." Furthermore, a

forensic psychiatrist is "trained to make decisions largely from documentary evidence" and does not depend on "see[ing] the patient." Matthews also admitted that when he had gone to the jail seeking to examine defendant, he brought four questions prepared by the prosecution.

Dr. Stewart, the defense expert, echoed Dr. Matthews's statement that interviews with defendant were not pivotal to his opinion. Stewart acknowledged that, unlike with Matthews, defendant did cooperate with his (Stewart's) efforts to examine him, and Stewart interviewed defendant twice. Stewart nonetheless told the jury that "taking away any interview [he] did with the defendant" would not change his opinion.

Both the prosecution and defense referenced defendant's refusal to be examined by Dr. Matthews during closing arguments. In discussing the testimony of Dr. Stewart, the prosecution criticized the expert for failing to take notes, forgoing a written report, and withholding his opinion until the last minute. The prosecution called such conduct — along with defendant's "refus[al] [of] a court-ordered exam" — "game playing" and said that such behavior "stinks."

In response, the defense explained why defendant declined to be interviewed by Dr. Matthews. Emphasizing that Matthews was a forensic psychiatrist and not a clinician, the defense counsel asked rhetorically, "Who would subject themsel[ves] to this evaluation by Dr. Matthews, who doesn't perceive you as a client . . . [but] as an evaluee?" Characterizing Matthews as someone who was "into it for 50 grand" — the amount of money Matthews said he received as his remuneration — the defense stated that Matthews's "opinion is not going to change" and as such, "nothing good was going to

come of [the doctor meeting with defendant]." Finally, referencing the court's instruction regarding the refusal, defense counsel urged the jury to think of it as "the punishment for Mr. Camacho not [being] willing to participate in that particular sham."

The court's instruction to the jurors read:

"Pursuant to California law, this court ordered the defendant, ADRIAN J. CAMACHO, to submit to a psychological examination by a doctor selected by the prosecution. The defendant refused to be examined or interviewed by him. If you find the defendant's refusal to answer questions or participate in the mental examination willful, you may take that fact into consideration when weighing the defense's expert opinions about the defendant's mental condition in this case. You may infer that the defendant wanted only his self-chosen experts, not others, to evaluate him."

### b. Analysis

As the trial judge's comments indicate, at the time of defendant's trial "decisional law authorized trial courts to order a defendant who placed his or her mental state in issue to submit to mental examination by prosecution experts." (*People v. Clark* (2011) 52 Cal.4th 856, 939 (*Clark*).) In 2008, however, this court held that such decisions did not survive the 1990 passage of Proposition 15. (*Verdin, supra*, 43 Cal.4th at pp. 1102, 1106.) That proposition added section 1054 to the Penal Code, which specifies that "no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the

United States." (§ 1054, subd. (e).) Because "nothing in the criminal discovery statutes (§ 1054 et seq.) authorizes a trial court to issue an order" requiring a defendant who has mounted a mental state defense to submit to an examination by prosecution experts, we concluded in *Verdin* that trial courts lacked the needed statutory authority to order such examinations. (*Verdin, supra*, 43 Cal.4th at p. 1109.)

The Legislature responded to our decision in *Verdin* by enacting a statute expressly conferring such power on trial judges. (See § 1054.3, subd. (b)(1) ["whenever a defendant in a criminal action . . . places in issue his or her mental state . . . through the proposed testimony of any mental health expert, upon timely request by the prosecution, the court may order that the defendant . . . submit to examination by a prosecution-retained mental health expert"]; *id.*, subd. (b)(2).) However, the rule announced in *Verdin* continues to apply to trials — like defendant's — conducted before January 1, 2010, the effective date of the newly enacted statute. (See *People v. Gonzales* (2011) 51 Cal.4th 894, 927 (*Gonzales*); see also, e.g., *People v. Banks* (2014) 59 Cal.4th 1113, 1193.)

Because *Verdin* applies in this case, the trial court erred in ordering defendant to be examined by Dr. Matthews, admitting Matthews's testimony that defendant refused to submit to the examination, allowing the prosecution to comment on such refusal during closing argument, and instructing the jury that it could consider defendant's refusal in considering Dr. Stewart's opinion. (See, e.g., *Verdin, supra*, 43 Cal.4th at p. 1116 [finding the court's order to be error]; *People v. Wallace* (2008) 44 Cal.4th 1032, 1087 (*Wallace*) ["admission of [a prosecution expert's] testimony regarding defendant's refusal to cooperate with the court-ordered psychiatric examination was

also error"]; *Clark, supra,* 52 Cal.4th at p. 940 ["comment on [the] defendant's refusal to be questioned" was error]; *Gonzales, supra,* 51 Cal.4th at p. 929 [court's instruction to the jury that "it could consider [the defendant's] refusal to be interviewed" by a prosecution-retained expert was "infected by the *Verdin* error"].) The question before us is whether such errors are so prejudicial as to require reversal of defendant's convictions.

The parties disagree about the standard under which these *Verdin* errors are to be assessed for prejudice. Defendant argues that these errors violated his federal constitutional rights and therefore should be subjected to a "harmless beyond a reasonable doubt" standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) The People, on the other hand, contend that "[t]he errors here involve state statutory law" and should be analyzed under the lower reasonable probability standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

Our case law supports the People's position that *Verdin* errors occurring at the guilt phase are assessed for prejudice "under the [*Watson*] standard for state law error, [i.e.,] whether there is a reasonable probability that the outcome of trial would have been more favorable to [the] defendant" had the errors not occurred. (*Clark, supra,* 52 Cal.4th at pp. 940–941; see also *People v. Hoyt* (2020) 8 Cal.5th 892, 941–942 (*Hoyt*).) This is because, in the circumstances here presented, a defendant does not have a constitutional right to refuse to be examined.

A long line of authorities, from both this court and the United States Supreme Court, establishes that the federal Constitution does not bar the government from performing a mental examination of a defendant "to rebut that defendant's presentation of expert testimony in support of a [mental state]

defense." (*Kansas v. Cheever* (2013) 571 U.S. 87, 89–90 ["The question here is whether the Fifth Amendment prohibits the government from introducing evidence from a court-ordered mental evaluation of a criminal defendant to rebut that defendant's presentation of expert testimony in support of a defense of voluntary intoxication. We hold that it does not"]; see also, e.g., *People v. Nieves* (2021) 11 Cal.5th 404, 436 (*Nieves*) ["Once [a] defendant place[s] [his or] her mental state at issue, [he or] she waive[s] her Fifth and Sixth Amendment rights to object to the prosecution examinations"]; *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1132–1133 (*Maldonado*) ["by electing to present [a mental state defense], [a defendant] will waive his privilege against self-incrimination to the extent necessary to support his claim and allow fair rebuttal. Forcing him to this choice does not offend the Constitution"]; *Clark*, *supra*, 52 Cal.4th at p. 940 ["Defendant cites no decision, and we are aware of none, holding that the Fifth Amendment or any other federal constitutional provision prohibits a court from ordering a defendant who has placed his or her mental state in issue to submit to a mental examination by a prosecution expert"]; *Gonzales*, *supra*, 51 Cal.4th at p. 929 ["It is settled that a defendant who makes an affirmative showing of his or her mental condition by way of expert testimony waives his or her Fifth and Sixth Amendment rights to object to examination by a prosecution expert"]; accord *Buchanan v. Kentucky* (1987) 483 U.S. 402, 422–423.) As such, although the trial court in this case committed error under state law by ordering an examination by the prosecution expert and allowing the jury to learn of defendant's refusal to be examined, this did not violate defendant's federal constitutional rights. We therefore analyze

whether the court's errors were prejudicial under the *Watson* standard.[11]

Based on the totality of the circumstances, we conclude it was not reasonably probable that the outcome of the trial would have been more favorable to defendant had the errors not occurred. Regarding the refusal, although Dr. Matthews referenced the fact that defendant declined to be examined, he did not use such refusal to criticize the defense expert's opinion. (Accord *People v. Krebs* (2019) 8 Cal.5th 265, 347 (*Krebs*) [finding harmless an expert's disclosure of the fact that a defendant declined to be interviewed when "the prosecution expert . . . 'did not rely on defendant's refusal to participate in

_____

[11]    To the extent defendant argues that the errors here amounted to constitutional violations of his right to remain silent — so-called *Griffin* or *Doyle* errors — he is mistaken. (*Griffin v. California* (1965) 380 U.S. 609, 615 ["the Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt"]; *Doyle v. Ohio* (1976) 426 U.S. 610, 619 ["the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause"].) Neither *Griffin* nor *Doyle* addressed circumstances in which a defendant has waived his privilege against self-incrimination by electing to put in issue his mental state, and it is clear that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." (*Estelle v. Smith* (1981) 451 U.S. 454, 468.)

Furthermore, "[t]he same reasoning [explaining why we find meritless defendant's Fifth Amendment arguments] applies to defendant's claim that [his] Fourteenth Amendment right to due process was violated." (*Gonzales*, *supra*, 51 Cal.4th at p. 929, fn. 18.)

the court-ordered examination' to criticize his opponent's conclusions"]; *Wallace, supra,* 44 Cal.4th at p. 1087 [same].)[12] Indeed, both the prosecution and defense experts stated that interviews with defendant were not pivotal to their opinions. Matthews testified that forensic psychiatrists such as himself rely on documentary evidence to form their opinions, not examinations of the individuals whose mental states they are assessing. Dr. Stewart likewise stated that without defendant's interviews, he would still reach the conclusions he did. These circumstances tend to reduce the likelihood that defendant was prejudiced by Matthews's comment regarding defendant's refusal to be interviewed. (Accord *Clark, supra,* 52 Cal.4th at p. 941 [finding evidence of a defendant's refusal to be interviewed to be harmless when a prosecution expert "did not suggest the fact that defendant refused . . . had any bearing on his diagnosis" and "nothing in the record shows [the expert] found any significance in defendant's refusal to submit to an examination"].)

Similarly, the prosecution's remarks on defendant's noncooperation were brief and not inflammatory. (Accord *Krebs, supra,* 8 Cal.5th at p. 347 [holding that *Verdin* errors were harmless despite "the prosecutor's brief comments in closing argument highlighting defendant's refusal to submit to an interview"].) The prosecution criticized various aspects of Dr. Stewart's methodology and included in that criticism defendant's refusal to meet with the prosecution expert. Some

---

[12] "We applied the higher 'reasonable possibility' standard in . . . *Wallace* [and *Krebs*], because the error in th[ose] case[s] occurred at the *penalty* phase of a capital trial when the more exacting standard applies." (*Clark, supra,* 52 Cal.4th at p. 941, fn. 24.)

of the prosecution's comments — those characterizing defense strategy as "game playing" or protesting that defendant's refusal "just stinks" — certainly were pointed. Nonetheless, the prosecution did not dwell on defendant's noncooperation. Rather, the thrust of the prosecution's comments was properly aimed at rebutting Dr. Stewart's testimony by emphasizing his failure to take notes, prepare a written report, disclose his opinion in a timely manner, or obtain and consider facts the prosecution viewed as crucial to evaluating defendant's mental state. To the extent the remarks amounted to a targeted attack on the defense rather than generalized protests about "fairness," they nonetheless did not prejudice defendant. (Cf. *Krebs*, *supra*, 8 Cal.5th at p. 346 [finding any error to be harmless despite the prosecution complaining about a lack of " 'fairness' " and " 'looking for the truth' " when the defendant declined to talk to the prosecution expert].)

This is, in part, because defense counsel explained his client's refusal to see Dr. Matthews. (Accord *Krebs*, *supra*, 8 Cal.5th at p. 347 ["the fact that the defense provided the jury with an explanation of why defendant refused to be examined by [a prosecution expert] . . . lean[s] against a finding of prejudice"].) Counsel suggested to the jury that Matthews was biased because he saw the individuals he interviewed not as "patients" but as "evaluee[s]" and that he brought questions prepared by the prosecutor when he attempted to examine defendant. In addition, by the time Matthews went to see defendant, he had already reached an opinion and billed the prosecution a substantial sum of money. Under such circumstances, argued counsel, Matthews was not going to change his views regardless of what defendant said to him. Knowing this, counsel stated, defendant understandably

refused to participate in a "sham" and so declined to subject himself to Matthews's questioning. This explanation tended to blunt the impact of defendant's refusal to cooperate with Matthews and diffused the prosecution's criticism that such refusal "just stinks."

Finally, the court instructed the jury that it could consider defendant's "refusal to answer questions or participate in the mental examination . . . when weighing the defense's expert opinions about the defendant's mental condition." It further stated that jurors "may infer that the defendant wanted only his self-chosen experts, not others, to evaluate him."[13] This last part of the court's instruction was taken from *Carpenter*, *supra*, 15 Cal.4th at page 413, where we said that "[t]he jury could properly infer that defendant wanted only his self-chosen

---

[13]     This instruction is not materially different from that given in *Gonzales*. There, the trial court told the jury "it had ordered examinations by Kaser-Boyd and Dr. Mills [two experts retained by the prosecution], that defendant had refused to be examined by Dr. Mills, and that her refusal 'may be considered by you when weighing the opinions of the defense experts in this case. The weight to which this factor is entitled is a matter for you to decide.'" (*Gonzales*, *supra*, 51 Cal.4th at p. 926.) We held that erroneous instruction to be harmless and, in so concluding, relied in no small part on the existence of Evidence Code section 730. (See *Gonzales*, *supra*, 51 Cal.4th at p. 928; Evid. Code, § 730 [authorizing a trial court "on its own motion or on motion of any party" to appoint an expert "to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial . . . to the fact or matter as to which the expert evidence is or may be required"].) We do not discuss section 730 here because the Attorney General has not argued its relevance to a determination of whether the *Verdin* errors were prejudicial.

experts, not others, to evaluate him, an inference relevant to its consideration of all the evidence of his mental condition."[14]

Evaluating the court's instruction alongside the prosecutor's argument and Dr. Matthews's reference to defendant's refusal to be interviewed, we are not convinced that the instruction tips the balance toward reversible error under *Watson*. First, we do not believe there was much further harm in telling the jury it "may" — but, by implication, need not — consider defendant's refusal to be examined in weighing the credibility of the defense expert, or infer that defendant wanted only some experts, and not others, to evaluate him. The latter is a sort of truism arising from the fact that defendant cooperated with his own experts, Drs. Ordas and Stewart, but not the prosecution's expert, Dr. Matthews. More broadly, the jury was not constrained by other instructions from considering defendant's nonparticipation even in the absence of an instruction. Second, to the extent the instruction indicates to the jury that it may weigh the *defense* expert's opinion differently if the defendant thwarts the *prosecution* expert's process, defense counsel highlighted what he considered to be the illogicality of the directive. Without apparent disagreement from the prosecution in rebuttal, counsel made this point, arguing that "there's nothing about Dr. Stewart's evaluation that is assailed" by a missing interview with Dr. Matthews.

---

[14] Although *Carpenter* has been overruled to the extent that it is inconsistent with *Verdin* (*Verdin, supra*, 43 Cal.4th at pp. 1106–1107), parts of the decision remain good law. (See, e.g., *Gonzales, supra*, 51 Cal.4th at p. 929 [quoting with approval *Carpenter, Danis,* and *People v. McPeters* (1992) 2 Cal.4th 1148 (*McPeters*) — cases that have been disapproved in part in *Verdin*].)

Ultimately, the issue the jury had to decide was the credibility of the experts, both the defense's and the prosecution's. With regard to that determination, it is true that the parties made arguments concerning defendant's refusal to submit to an examination and that the instruction facilitated the argument. However, the record indicates that these arguments were tangential to the primary dispute over the experts' methods and conclusions. In sum, a different verdict at the guilt phase absent the *Verdin* errors was not reasonably probable.

In addition to contending that the *Verdin* errors warrant reversal of his convictions, defendant also makes conclusory assertions that the errors deprived him of his right to a reliable penalty determination. Defendant forgoes any specific argument regarding penalty phase prejudice. Instead, he generically asserts (primarily in the section headings within his briefing) that the various errors violated that right.

To the extent such arguments are not waived for failure to support them (see, e.g., *People v. Lawley* (2002) 27 Cal.4th 102, 169, fn. 25; *People v. Williams* (1997) 16 Cal.4th 153, 206), they are meritless. It does not appear that any mention of defendant's refusal to submit to a court-ordered examination was made at the penalty phase. Certainly, defendant's own recitation of the relevant facts is limited to the guilt phase, and he offers no elaboration concerning how evidence relating to the *Verdin* claim may have spilled over to the penalty determination and tainted that decision as well. Under these circumstances, there was no reasonable possibility that the *Verdin* errors affected the death judgment. (See, e.g., *Clark*, *supra*, 52 Cal.4th at p. 941, fn. 24.)

Defendant advances various counterarguments in an attempt to show that the *Verdin* errors rise to a constitutional dimension in this case. (But see *Clark, supra,* 52 Cal.4th at p. 940; *Hoyt, supra,* 8 Cal.5th at pp. 941–942.) Specifically, defendant argues that the trial court violated his privilege against self-incrimination because it did not confer upon him " 'advance assurance of immunity against overbroad direct and derivative use of [his] responses to the examiners.' " We disagree.

Defendant's argument rests largely on *Maldonado, supra,* 53 Cal.4th at page 1112. In *Maldonado*, this court confronted the issue of "what general limits, if any, may properly be imposed on prosecutorial access to court-ordered examinations and their results . . . in order to vindicate or protect the defendant's Fifth and Sixth Amendment rights." (*Id.* at p. 1117.) We concluded that the limits mandated by the Constitution are few. In the context of a court-ordered examination, the Fifth Amendment allows "direct or derivative use of [a defendant's] statements to the prosecution examiners," although only to the extent necessary "to rebut any mental-state evidence [the defendant] presents through his own experts." (*Maldonado, supra,* 53 Cal.4th at p. 1129; see also *id.* at p. 1125 ["The prosecution is . . . constitutionally permitted to obtain its own examination of the accused, and to use the results, including the accused's statements to the prosecution examiners, as is required to negate the asserted defense. If the defendant refuses to cooperate with the prosecution examiners, the court may impose sanctions, such as advising the jury that it may consider such noncooperation when weighing the opinions of the defense experts. On the other hand, except for appropriate rebuttal, the defendant's statements to the

prosecution experts may not be used, either directly or as a lead to other evidence, to bolster the prosecution's case against the defendant"].)

*Maldonado* also elucidated the various ways in which the defense can ensure that the prosecution does not misuse materials elicited during a court-ordered examination. This is accomplished primarily through litigation at trial. (See *Maldonado*, *supra*, 53 Cal.4th at pp. 1137–1138.) In particular, once "the prosecution commences its rebuttal case, the defense can raise specific objections to particular evidence." (*Id.* at p. 1138.) "At this stage, the court is in the best possible position to determine whether particular rebuttal evidence proffered by the prosecution exceeds the scope of the defendant's Fifth Amendment waiver." (*Ibid.*) Furthermore, because *Maldonado* was decided after the enactment of section 1054.3, we explained in a footnote that "[t]o the extent petitioner and other criminal defendants are entitled, as a prophylactic protection of their Fifth Amendment privilege, to decline to submit to court-ordered mental examinations until they receive advance assurance of immunity against overbroad direct and derivative use of their responses to the examiners, we may, and we do, *judicially declare* such an immunity as ' "reasonably to be implied" ' from the statutory provision allowing the prosecution to obtain such examinations for the limited purpose of rebutting anticipated mental-state defenses." (*Maldonado*, *supra*, at p. 1129, fn. 10.)

Seizing on this language, defendant argues that because section 1054.3 did not exist at the time of his trial, no such immunity may reasonably be deemed to have been conferred in his case. Pointing to the language of the court's order, which did not provide "advance assurance of immunity against overbroad

direct and derivative use of [the defendant's] responses to the examiners," defendant argues that in fact no such immunity was extended. (*Maldonado, supra,* 53 Cal.4th at p. 1129, fn. 10.) Defendant implies that under such circumstances, he was within his constitutional right to refuse to submit to the order — or conversely, that by signing such an order, the court violated the constitutional guarantee protecting defendant against self-incrimination.

We reject defendant's argument. First, although we do not need to decide the issue because the Attorney General did not brief it, defendant's argument appears forfeited. It is true that defendant objected to the court's order and ultimately refused to cooperate with Dr. Matthews. Yet, he did not base either his objection or refusal on the court's alleged failure to provide "advance assurance" that his statements would be introduced only for proper rebuttal purposes. (*Maldonado, supra,* 53 Cal.4th at p. 1129, fn. 10.) If defendant were concerned about the potential overbroad use of his statements, he could have said as much. Even before *Maldonado* was decided, the case law suggested that statements made during a court-ordered examination could be used only for rebuttal purposes. (See, e.g., *Danis, supra,* 31 Cal.App.3d at pp. 785–786; cf. *People v. Perez* (2020) 9 Cal.5th 1, 7–8 (*Perez*) [" ' "[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence" ' "].) Had defendant brought the issue to the court's attention, the court could have addressed his concerns about any overbroad use of a psychiatric evaluation. (See, e.g., *People v. Simon* (2001) 25 Cal.4th 1082, 1103 [explaining that "the basic rationale of the forfeiture doctrine" is " ' " 'to encourage a defendant to bring

errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had' " ' "].)  Under such circumstances, defendant's failure to raise the issue may well have resulted in forfeiture.

Second, the record in this case confirms that all parties involved understood the intended use of any interview a prosecution expert conducted with defendant would be limited to rebutting defendant's mental state defense.  The People's motion requesting that the court issue an order requiring defendant to sit for such an examination stated as much.  The People's oral argument in the court and the exchange between the trial judge and the parties suggest the same.  And, of course, the court referred specifically to *Danis* — with its attendant limiting language — in granting the prosecution's motion for an examination.

In addition, decisional law relied upon by the trial judge underscored the proper role of this evidence as limited to the rebuttal of the defendant's proffered mental state evidence.  (See *McPeters*, *supra*, 2 Cal.4th at p. 1190 ["By tendering his mental condition as an issue in the penalty phase, defendant waived his Fifth and Sixth Amendment rights *to the extent necessary to permit a proper examination of that condition. . . .*  Any other result would give an unfair tactical advantage to defendants, who could, with impunity, present mental defenses at the penalty phase, secure in the assurance they could not be rebutted by expert testimony based on an actual psychiatric examination" (italics added)]; *Carpenter*, *supra*, 15 Cal.4th at p. 412 [same]; *Danis*, *supra*, 31 Cal.App.3d at pp. 785–786 ["The sole issues are whether the court committed reversible error in granting the prosecution's motion to have a court-appointed psychiatrist examine defendant and in permitting the doctor to

testify *in rebuttal* to the medical testimony introduced by defendant on the subject of defendant's diminished capacity" and "opinion testimony from a court-appointed psychiatrist based upon his examination of a defendant in a criminal case is admissible *as prosecution rebuttal* during the guilt phase of the trial, once the defendant has placed his mental condition in issue by proffering an insanity or diminished capacity defense" (italics added)].)

Third, defendant's refusal to be examined was *in fact* used only to rebut defendant's argument that he lacked the requisite mental state for the more serious crimes. As noted, Dr. Matthews referenced defendant's refusal in his testimony as a rebuttal witness; the prosecution mentioned the refusal in seeking to refute the defense expert's opinion that defendant suffered from a diminished mental state; and the court's instruction permitted the jury to consider the refusal in assessing the same defense expert's opinion. Defendant therefore had no occasion to "raise [at trial] specific objections to particular evidence" regarding his refusal to comply with the court's order. (*Maldonado*, *supra*, 53 Cal.4th at p. 1138.) In such circumstances, to hold that the court nonetheless violated defendant's constitutional rights by not expressly specifying that the result of the court-ordered examination would be used only in rebuttal is unwarranted.

Defendant claims various other asserted infirmities concerning the court's instruction. He argues that the court compounded its error by denying the defense proposal that the court instruct the jury that defendant refused to submit to the court-ordered examination on the advice of counsel. According to defendant, "[r]elying on an attorney's advice for a course of action may defeat an allegation of willfulness and the trial court

should have instructed the jury that when [defendant] refused to submit to the examination, he was acting on the advice [of] his attorneys and that fact could be taken into consideration in determining if the refusal was willful."

Defendant has cited no case establishing the premise that "[r]elying on an attorney's advice for a course of action may defeat an allegation of willfulness" in the context of court-ordered examinations. (See *Nieves, supra*, 11 Cal.5th at p. 437 ["Defendant cites no authority for her view that she did not personally refuse to be examined, and she offers no reason to dispel the general rule that absent complaint at trial, the acts of her counsel are imputed to her"].) Furthermore, even if we accept that defendant followed his counsel's advice, this might, at most, have led a juror to find that defendant's refusal was not willful. But in assessing the harm caused by the instruction, we have assumed one or more jurors found "the defendant's refusal to answer questions or participate in the mental examination [was] willful" and took that into consideration when weighing the expert opinions regarding the defendant's mental condition. Given this assumption, the fact that the jury was not instructed that defendant followed the advice of his counsel could not have prejudiced defendant.

Defendant further argues that the court's instruction allowing the jury to infer from defendant's refusal to meet with Dr. Matthews "that the defendant wanted only his self-chosen experts, not others, to evaluate him" was unsupported by evidence. But at trial, the parties presented testimony establishing that defendant cooperated with experts chosen by the defense, Drs. Ordas and Stewart, yet not with an expert retained by the prosecution, Matthews. The defense also explained why defendant did not want Matthews — the only

psychiatric expert not selected by defendant — to examine him. Upon this record, we cannot say that no evidence supports the inference permitted by the court's advisement.  (Accord, *People v. Alexander* (2010) 49 Cal.4th 846, 905–906.)

### 2.  *Admission of letters written by defendant*

### a.  *Background*

Defendant objects to the court's admission into evidence of two letters he authored.  The prosecution sought to introduce these letters to show defendant's motive in the charged crimes. Defendant wrote both letters while in pretrial detention on the current charges.  The first was written in early August 2003, about two months after the June 13 shooting death of Officer Zeppetella:

> "I'm doing a lot better, thank you very much, had a little problem here and there with these fucks (cops) but other than that and all the muthafucking crying that goes on here, it's all good! . . .

> "Today they extracted p-wee's celli there in E-1 over some fuckin bullshit and the only reason I don't put a green light on these fucks is because he's always fucking up."

The second letter was written in late August 2003, evidently in response to some problem defendant was experiencing with the mail system at the jail:

> "I tell you these fucks are really asking for me to make an example.  These fucks don't understand how important it was for that letter to get out.  Only cause they go home everyday, they think theyre tuff

ass'es.  Its going to be a big surprise when I send one of them home in a fucken bodybag!"

The prosecution argued that the letters showed "an animosity towards law enforcement" and were "relevant on the issue of intent" or motive.  The defense objected to admission of the letters on the grounds they purportedly constituted inadmissible hearsay and should in any event be excluded under Evidence Code section 352.  After hearing arguments from both sides, the trial court admitted the letters, finding them "directly relevant to defendant's attitude toward law enforcement" and "relevant to motive and as to [defendant's] state of mind in June of 2003, the time of the incident."

At trial, the prosecution mentioned the letters in its opening and closing statements.  During opening remarks, the prosecution read to the jury portions of the letters and argued that they were evidence of defendant's "special malice, . . . special anger directed towards law enforcement."  The prosecution also introduced testimony to clarify that the term "green light" — as used in the first letter — "is a prison terminology or street terminology [that means] it's okay to kill this person."  During closing argument, the prosecution again argued that the letters showed defendant harbored "special malice towards officers."  Responding to defense questioning of witnesses and anticipating opposing counsel's closing comments, the prosecution asserted that the letters explained why defendant engaged in seemingly "[un]necessary" violence against Officer Zeppetella.  In contrast to defense counsel's theory that defendant displayed "violence beyond that necessary . . . because [of] the drugs and the Paxil," the prosecution attributed defendant's brutality — his shooting the victim 13 times — to defendant's "special malice."

The prosecution returned to the letters in its closing statement at the penalty phase, using them to cast doubt on defendant's remorse for the killing of Officer Zeppetella.

### b. *Analysis*

Defendant argues that the letters should have been excluded as inadmissible character evidence under Evidence Code section 1101, subdivision (a). Under that provision, and subject to certain exceptions, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) Defendant further contends that whether the letters constituted "[c]haracter evidence or not," they were irrelevant to the issue of his intent, motive, or state of mind. Finally, as noted, he asserts the letters should have been excluded pursuant to Evidence Code section 352, which provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We address these arguments seriatim.

As a preliminary matter, we agree with the People that defendant has not preserved the issue for review because he failed to argue below that the letters constituted inadmissible character evidence. (See, e.g., *People v. Valdez* (2012) 55 Cal.4th 82, 130 (*Valdez*) [the "defendant's argument under Evidence Code section 1101 is not cognizable on appeal because he failed to object on this basis at trial"]; *People v. Demetrulias* (2006)

39 Cal.4th 1, 20–21 (*Demetrulias*).) At trial, defendant objected to admission of the letters because, in his view, they were hearsay, not subject to any exception and their probative value was substantially outweighed by the danger of prejudice. Defense did not once assert that the letters constituted character evidence, or argue that they reflected evidence of a trait of his character improperly offered to prove "his . . . conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) As such, defendant cannot be heard now to complain on this ground. (See *Valdez, supra*, 55 Cal.4th at p. 130.)

Defendant seeks to excuse his failure to raise a specific objection by arguing that "[a]ll of the parties were experienced litigators" and therefore "saw no need to identify for the record that the letters were character evidence" despite understanding them to be such. The contention fails to persuade. Experienced or not, counsel needed to make a timely and specific objection on the ground asserted on appeal. (See, e.g., *Valdez, supra*, 55 Cal.4th at p. 130.) Furthermore, insofar as the parties wrangled over the tendency of the letters to demonstrate animosity toward law enforcement and therefore establish defendant's motive in killing a police officer, such arguments do not reflect that the litigants and the court all implicitly treated the letters as character evidence and, as defendant now asserts, "moved directly to the subject of whether they came in as an exception under [Evidence Code section] 1101(b)." Although subdivision (b) of section 1101 refers to evidence of motive (along with other types of evidence), there is no reason that evidence of motive necessarily is also evidence of character. Moreover, the record here makes clear that the prosecution described the letters as tending to show motive in response to the court's query

regarding their relevance, *not* how they fit under an exception to character evidence.

On the merits, we are persuaded the trial court did not abuse its discretion in finding the letters to be relevant regarding the issue of motive and as such, admissible under Evidence Code section 1101, subdivision (b).  (See, e.g., *People v. Crittenden* (1994) 9 Cal.4th 83, 132 (*Crittenden*) ["The trial court has broad discretion in determining the relevance of evidence"]; *People v. Mickey* (1991) 54 Cal.3d 612, 668 (*Mickey*) ["The appropriate standard of review for a ruling on admissibility over an objection of irrelevance and/or undue prejudice is abuse of discretion"]; *People v. Gordon* (1990) 50 Cal.3d 1223, 1239 (*Gordon*) [same].)  That provision states:  "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."  (Evid. Code, § 1101, subd. (b).)

Relevant evidence is that "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  In this case, the central fact in dispute was defendant's state of mind when he shot and killed Officer Zeppetella.  The prosecution maintained that defendant premeditated and deliberated the murder of the victim, and, as part of that charge, had to prove that defendant acted with malice aforethought.  The defense, on the other hand, urged that defendant killed Officer Zeppetella because defendant was delirious and psychotic due to the influence of drugs.  The letters were relevant to this dispute "because, if the defense version of events were true, one might

reasonably expect defendant, upon recovering from the psychotic episode and realizing the senseless violence he had done" not to engage in thoughts and words showing him to contemplate doing further violence to people detaining him. (*People v. Bell* (2007) 40 Cal.4th 582, 606 (*Bell*).) Conversely, if the prosecution theory of the crime were correct, defendant's hostility and willingness to resort to violence against persons in authority "would more clearly be expected." (*Ibid.*) More directly, although other inferences are possible, one may reasonably conclude that the letters showed defendant harbored hostility toward law enforcement, and it was this hostility — not delusions or psychosis — that drove him to shoot Officer Zeppetella 13 times. Under such circumstances, we cannot say that the letters did not have "*any* tendency" to prove a disputed fact. (Evid. Code, § 210, italics added.)

Defendant's arguments to the contrary appear to conflate the probative value of a piece of evidence with its relevance. Reprising assertions raised before the trial court, defendant contends the letters simply "reflected defendant's attitude towards his jailers" and so "were not relevant to any issues involving a patrol officer such as Officer Zeppetella." Yet, in his early August letter, defendant referred to "these fucks" and parenthetically clarified that he meant he was having trouble with "cops." Defendant then mentioned "put[ting] a green light on these fucks." Likewise, in the later August letter, defendant once again alluded to "these fucks" and said it was going to be a "big surprise" when he "send[s] one of them home in a . . . bodybag." Whether defendant was simply expressing frustration with his jailers or manifesting hostility toward law enforcement more generally in writing the letters was a factual question for the jury. Likewise, whether the letters reflected

sentiments defendant held on the day of the crime was a determination for the jury. Defendant was free to urge the jury to discount the letters for the reasons he now suggests. At bottom, although defendant couches his argument as one concerning the relevance of the communications, his assertions are really aimed at the weight of the evidence. (See, e.g., *People v. Turner* (2020) 10 Cal.5th 786, 805 [" 'Relevance' describes whether evidence should be heard because it might reasonably resolve a dispute. 'Weight' describes the degree to which the jury finds the evidence probative"].) Simply because the letters would have had more probative value if they contained a "definitive indication" that "the sentiments expressed were long held" or directly referenced "the crime or . . . Officer Zeppetella" does not render them irrelevant otherwise.

We are further persuaded that the court did not err in refusing to exercise its discretion under Evidence Code section 352 to exclude the letters. (See, e.g., *Mickey*, *supra*, 54 Cal.3d at p. 668; *Gordon*, *supra*, 50 Cal.3d at p. 1239.) Any potential prejudice arising from admission of the letters was low given that the unsavory language and sentiment expressed therein were not unduly prejudicial, or " 'of such nature as to inflame the emotions of the jur[ors], motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.' " (*People v. Doolin* (2009) 45 Cal.4th 390, 439.) Here, undisputed evidence showed that defendant — unprovoked by anything the victim did — shot a police officer 13 times, firing when the officer was already down and crawling away, beat the officer's head repeatedly, and then absconded in the patrol car after making sure the victim was no longer moving. In light of the brutality of the charged crimes,

admission of evidence that defendant used offensive language in describing unperformed acts of violence did not create an intolerable risk of prejudice. (Accord, *ibid.* ["Although evidence of D.'s rape and Hamblen's mistreatment is unpleasant, it paled in comparison to the testimony from four witnesses that defendant tried to kill them"]; *People v. Eubanks* (2011) 53 Cal.4th 110, 146 (*Eubanks*) ["here, where the charged offenses included four counts of first degree murder based on defendant having killed her four children, admission of evidence that defendant had mistreated her nephew once by rubbing his face in feces" was not an abuse of discretion].) This conclusion is strengthened by the fact that the prosecution "did not suggest to the jury that it consider the [letters] for any improper purpose," instead appropriately utilizing the evidence as demonstrating defendant's motive and to rebut the defense theory of mental incapacity. (*Demetrulias*, *supra*, 39 Cal.4th at p. 19; accord *Doolin*, *supra*, 45 Cal.4th at p. 439; *Bell*, *supra*, 40 Cal.4th at p. 607 [because "the evidence was probative on the central factual issue of the case, and as its introduction was clearly targeted to that issue rather than to creation of prejudicial emotion, we cannot agree with defendant that the court's choice to admit it was arbitrary or capricious"].)

Because we find no merit in defendant's claims of state evidentiary law, "we reject the associated contention that introduction of the evidence violated defendant's constitutional rights . . . under . . . the United States Constitution."[15] (*Bell*,

---

[15] Defendant also complains about the prosecution's reference to the letters at the penalty phase, arguing that their assertedly erroneous admission at the guilt phase deprived him

*supra*, 40 Cal.4th at p. 607; see also, e.g., *Valdez*, 55 Cal.4th at p. 134 ["Because there was no statutory error, his constitutional claims . . . fail"].)

### 3. *Exclusion of defense witnesses' testimony*

### a. *Background*

Defendant claims the trial court erred when, on three occasions, it sustained objections to testimony of defense witnesses "that would tend to prove [defendant] was sincere in his efforts to end his addiction to drugs." Two of these instances occurred during the testimony of Stacey Camacho. During her direct examination, Stacey was asked, "Did it appear to you that Adrian was sincere in his efforts to get off of drugs [during the year preceding the shooting], or did it appear that he was just playing you?" The prosecutor interposed an objection, stating "[Y]our Honor: Speculative." The court sustained the objection, and defense counsel continued, "If you know, based on your relationship with Adrian, did it seem to you — were his actions and words and behavior — did they appear sincere?" The

---

of a reliable penalty determination. As discussed, we are of the view that there was no error relating to the trial court's decision to admit defendant's writings. Moreover, the prosecution made proper use of the letters during the penalty phase, employing them to suggest that defendant did not experience remorse for killing the victim. " '[R]emorse is universally deemed a factor relevant to penalty," and "[n]o misconduct or constitutional error occurred" when, as here, "the prosecutor merely anticipated predictable defense argument urging sympathy for defendant and sought to negate its mitigating effect by highlighting defendant's apparent lack of concern for the murder victim." (*People v. Bemore* (2000) 22 Cal.4th 809, 854–855 (*Bemore*).)

prosecutor again objected on the same ground, and the court once more sustained the objection.

The second occasion in which the court sustained an objection concerned Stacey's testimony regarding a time during which defendant was being treated at Aurora Hospital. Defense counsel had asked Stacey, "When he was hospitalized, can you describe how his demeanor was, what he was physically depicting to you by his demeanor?" Stacey responded, "He was really depressed. He was — he was crying a lot because he wanted to stop using drugs so bad, and he couldn't. He would try not to use drugs, and if he would go too long without it, he would get sick. He couldn't get out of bed. He said that his bones would hurt." At this point, the prosecutor made a hearsay objection, which was sustained.

The third instance involved the testimony of Lonnie Roybal, defendant's coworker. The following exchange took place during Roybal's examination:

| "Question: | Okay. And when [defendant] talked with you about his drug problem with heroin, what was his demeanor like? |
|---|---|
| "Answer: | He cried a couple of times. He was pretty sad about it. I mean, he wanted help, you know, off it. |
| "[Prosecutor]: | I'm going to object, your honor, as hearsay what he said. |
| "THE COURT: | Sustained. |
| "[Prosecutor]: | Move to strike. Ask the jury be told to disregard. |

"THE COURT: Answer will be stricken. Jury to disregard.

"Question: When he'd talk with you about his problems and he'd cry, did you ever know him to also show evidence of using, to the extent you might know?"[16]

The examination thereafter resumed.

In contrast to the above witnesses, Dr. Ordas was permitted to testify concerning defendant's "sincer[ity] in his efforts to end his addiction to drugs." In setting up Ordas's testimony, defense counsel first asked the doctor to describe the symptoms an addict experiences when withdrawing from heroin. Ordas stated, "If . . . not treated, [that is] the addict doesn't actually get some more drugs or gets in treatment, then often it [the withdrawal symptoms] progresses to a much worse state that can include incredible joint pain — when I say joint, I don't mean just a bit — but serious pain in the joints of the body, diarrhea, vomiting, nausea, headaches, that kind of stuff." Counsel subsequently asked Ordas to "describe for the jury [defendant's] demeanor and attitude about treatment with you." Ordas replied, "In general, he was highly motivated." Counsel then directly inquired whether in Ordas's interactions with defendant, defendant seemed "sincere in his efforts." Ordas reiterated that defendant was sincere most of the time.

---

[16] Defense counsel's question — referring to the prior testimony of defendant crying — makes clear it is only the last part of Roybal's answer (that defendant "wanted help . . . off [heroin]") that was struck by the court.

### b. *Analysis*

Defendant asserts the trial court erred in sustaining the prosecution's objections to the defense witnesses' testimony. In examining defendant's claims, we keep in mind that we review the trial court's ruling, "not the court's reasoning and, if the ruling was correct on any ground, we affirm." (*People v. Geier* (2007) 41 Cal.4th 555, 582 (*Geier*); see also, e.g., *People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12 [same]; *People v. Jones* (2012) 54 Cal.4th 1, 50 (*Jones*); *People v. Fuiava* (2012) 53 Cal.4th 622, 668–669 (*Fuiava*); *People v. Zapien* (1993) 4 Cal.4th 929, 976 [" ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion" ' "].)

Here, although the trial court sustained the prosecution's objections on varying grounds (hearsay and speculation), the testimony regarding whether defendant was sincere in his efforts to stop using drugs was properly excluded because it was irrelevant. (See Evid. Code, § 350 ["No evidence is admissible except relevant evidence"]; see also, e.g., *Crittenden*, *supra*, 9 Cal.4th at p. 132 ["The trial court has broad discretion in determining the relevance of evidence [citations], but lacks discretion to admit irrelevant evidence"].) Because defendant did not contest that he shot and killed Officer Zeppetella, the central issue for the jury was defendant's state of mind when he opened fire. Whether defendant was sincere in his attempts to quit drugs in the year before he shot the officer was at best

weakly linked to an impaired mental state on the day of the shooting. Had defendant been sincere about wanting to quit drugs, that would presumably increase the likelihood that defendant had actually stopped taking drugs at the time of the killing, was not then under the influence, and so would be more likely to harbor malice. But this inference was not available in this particular case given that all the evidence of defendant's supposed sincerity about stopping use of drugs — all sought to be introduced by the defense — was coupled with evidence that defendant, in fact, did not cease his drug use. Dr. Ordas, for example, testified that defendant was "sincere in his efforts" to quit drugs "most of the time" and yet "always seemed to relapse" into drug use. Because there was no suggestion that defendant actually stopped his drug use, the sincerity of his attempts to cease his addiction had no "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination" of defendant's state of mind. (Evid. Code, § 210.) As such, testimony intended to show defendant "was sincere in his efforts to end his addiction to drugs" was properly excluded.

Defendant offers no argument regarding the relevance of the challenged testimony. Instead, he insists that Stacey should have been allowed to answer the question about whether defendant's "actions and words and behavior . . . appear sincere" because such question elicited a lay opinion permitted under Evidence Code section 800. Likewise, he contends that Stacey's statement that defendant said "his bones would hurt" constituted a statement concerning defendant's "then existing state of mind, emotion, or physical sensation" admissible under Evidence Code section 1250. Last, he asserts that Roybal's statement that defendant "wanted help . . . off [drugs]" was not

hearsay but a description of defendant's demeanor as Roybal observed it.

Yet, none of the grounds of admissibility defendant posits allows for the admission of irrelevant evidence. (See Evid. Code, § 800 ["If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion *as is permitted by law*" (italics added)]; *People v. Edwards* (2013) 57 Cal.4th 658, 726 (*Edwards*) ["Even assuming the evidence defendant sought to elicit from [two witnesses] was admissible to show defendant's state of mind, state of mind evidence must nonetheless be relevant"]; *People v. Hernandez* (2003) 30 Cal.4th 835, 872 ["A prerequisite to this exception to the hearsay rule [created by Evidence Code section 1250] is that the declarant's mental state or conduct be factually relevant"]; *Geier, supra,* 41 Cal.4th at p. 586 [similar]; Evid. Code, § 702, subd. (a) [providing that "the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter" but does not otherwise establish that testimony is admissible whenever a witness has personal knowledge of the matter].) Evidence Code section 350 makes clear that "[n]o evidence is admissible except relevant evidence," and defendant has not cleared this hurdle for admissibility.

Furthermore, even assuming that the trial court erred in excluding portions of Stacey's and Roybal's testimony, any error was harmless given what Dr. Ordas told the jury. (Accord, *Edwards, supra,* 57 Cal.4th at p. 726.) Although Stacey's statement that defendant said his bones would hurt when he stopped using drugs drew an objection, Ordas testified to the severe joint pain, along with other serious symptoms, that someone like defendant would experience when withdrawing from drugs. Ordas further testified that defendant was "highly

motivated" and sincere, although unsuccessful, in his efforts to quit taking drugs. And as mentioned, any inference raised by evidence of defendant's supposed sincerity in stopping drug use was adverse to defendant's case of mental impairment on the day of the shooting. Under such circumstances, it was not "reasonably probable that a result more favorable to [defendant] would have been reached" if the testimony from Stacey and Roybal had been admitted. (*Watson, supra*, 46 Cal.2d at p. 836.)

### 4. Asserted prosecutorial misconduct

#### a. Background

During closing argument, the prosecutor criticized Dr. Stewart's opinion and methodology at some length. The prosecutor first highlighted Stewart's failure to produce a report or timely render an opinion and then stated, "[h]e does not review the entire file, which is a violation of the ethics and conduct of forensic psychiatry." Defense counsel objected that the prosecutor was testifying. The court asked counsel to clarify, and counsel stated, "These are not facts in evidence." The prosecutor responded, "Dr. Matthews," whereupon the court overruled the objection.

The prosecutor then told the jury, "Check Dr. Matthews' testimony. Dr. Mathews told us — remember that — I won't take a case unless I can have the whole file, because it isn't right." The prosecutor further commented, "None of us can be charged with knowing what the ethical obligations of forensic psychiatry [are]. But it was Dr. Stewart's responsibility to call [defense counsel] up and say: Excuse me. I cannot consult in a case unless I get the run of the file. Because [counsel] are advocates, and we may inject our own bias into the materials [we send]."

### b. *Analysis*

Defendant contends the prosecutor committed prejudicial misconduct by arguing matters outside the record in stating that Dr. Stewart's failure to review the entire file was "a violation of the ethics and conduct of forensic psychiatry." Certainly, "[a] prosecutor commits misconduct by referring in argument to matters outside the record." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026 (*Cunningham*).) Nonetheless, "the prosecution has broad discretion to state its views regarding which reasonable inferences may or may not be drawn from the evidence" (*ibid.*) and " '[w]hether the inferences the prosecutor draws are reasonable is for the jury to decide' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 179). "To constitute a violation of the federal Constitution, prosecutorial misconduct must ' "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People v. Benavides* (2005) 35 Cal.4th 69, 108.)

Here, the prosecutor's comment was based on Dr. Matthews's testimony. Matthews — a board certified forensic psychiatrist — discussed the standards for forensic psychiatry. He first described a forensic psychiatrist as "a psychiatrist . . . who puts their expertise at the service of the legal system," stating that "[t]he purpose of forensic psychiatry is to find the truth and to learn enough about the situation so that you can be of service in some way to the judicial system. It means that rather than having one's loyalty to the patient or the person you're examining, that your major loyalty is to

principles of honesty and principles of objectivity." Matthews was subsequently asked whether "it [was] important . . . that a forensic psychiatrist be allowed to basically have at the whole body of document" and responded that he could not do the work without having access to the entire record.

The prosecutor's comments did not infect the trial with unfairness that rises to the level of prejudicial error. When viewed in context, the prosecutor made clear that he was basing his argument on Dr. Matthews's testimony and not outside knowledge regarding "the ethical obligations of forensic psychiatry." Not only did the prosecutor's argument following the challenged comment closely track Matthews's testimony, but the prosecutor also expressly told the jury to "[c]heck Dr. Matthews' testimony" and "remember" "[w]hat Dr. Matthews told us." Furthermore, the prosecutor acknowledged that "[n]one of us [advocates] can be charged with knowing what the ethical obligations of forensic psychiatry [are]," indicating he did not have independent knowledge of "the ethics and conduct of forensic psychiatry." It was thus not reasonably likely that the jury construed the prosecutor's comments in the objectionable manner defendant suggests. (See, e.g., *Cunningham*, *supra*, 25 Cal.4th at p. 1001.)

### 5. Alleged errors under Sanchez

In his supplemental briefing, defendant argues that the testimony of two witnesses — Dr. Matthews and Officer Carnahan — violated the rule set forth in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*) concerning hearsay and expert testimony.

In *Sanchez*, we held that "[i]f an expert testifies to case-specific out-of-court statements to explain the bases for his

opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay." (*Sanchez*, *supra*, 63 Cal.4th at p. 684.) "Like any other hearsay evidence," such statements must be "properly admitted through an applicable hearsay exception" or "an appropriate witness." (*Ibid.*) Otherwise, the admission of such statements constitutes error. Depending on whether the statements are testimonial, the prejudicial effect of their admission is assessed under either the standard articulated in *Chapman*, *supra*, 386 U.S. at page 18 or that found in *Watson*, *supra*, 46 Cal.2d at page 818. (See, e.g., *People v. Navarro* (2021) 12 Cal.5th 285, 310 (*Navarro*).)

The failure to object at trial before *Sanchez* was decided does not forfeit a claim raising so-called *Sanchez* errors. (*Perez*, *supra*, 9 Cal.5th at p. 9.)

### a. *Dr. Matthews's testimony*

Regarding Dr. Matthews's testimony, defendant argues the doctor ran afoul of *Sanchez* in conveying to the jury "that he relied on inadmissible hearsay to form his opinion regarding defendant's mental state." But if all Matthews did was to tell the jury that he relied on materials sent to him by the prosecution in forming his opinion, then *Sanchez* does not prohibit such testimony.

As we stated in *Sanchez*, "[a]ny expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so." (*Sanchez*, *supra*, 63 Cal.4th at p. 685, italics in original; see also *id.* at p. 686 [recognizing that under the court's holding, an expert may "tell[] the jury the expert relied on additional kinds of information that the expert only generally describes"].) The limitations that *Sanchez* placed on expert testimony concern case-specific information that an

expert relates to a jury, not materials upon which the expert relies. (See, e.g., *id.* at p. 685 [stating that experts cannot "present, as facts, the content of testimonial hearsay statements" and "only when a prosecution expert relies upon, and *relates as true*, a *testimonial* statement would the fact asserted as true have to be independently proven to satisfy the Sixth Amendment" (first italics added)]; *id.* at pp. 676, 684.) Regarding the sources upon which the expert relies, *Sanchez* recognizes that the expert "may still *rely* on hearsay" and the expert is permitted "to relate generally the kind and source of the 'matter' upon which his opinion rests." (*Id.* at pp. 685–686.)

Here, Dr. Matthews told the jury very little of the contents of the materials he reviewed in forming his opinion. This was deliberate. Before Matthews testified, the court had an extensive discussion with the parties regarding the scope of the expert's testimony. Defense counsel argued at length that Matthews should not be able to *relate* to the jury details gleaned from defendant's criminal record. In contrast, counsel accepted that Matthews should be able to *rely* on such records in forming his opinion, specifically the opinion that defendant had antisocial personality disorder. Consistent with *Sanchez*, counsel also conceded that Matthews "can say what he relied on" but "should not be allowed to speak to hearsay." The court generally agreed with counsel, ruling, for instance, that the expert is "not allowed to talk about the details of the convictions, how many, what they are" but what "he can say is I've reviewed the file, and it does show a criminal history."

To ensure that Matthews's testimony would conform to the court's rulings, the prosecutor asked leading "yes-no" questions of the witness. A typical exchange is as follows:

"Question:        [By the prosecutor] Okay. All right. So let me just kind of walk you through it, then.

"All right. And these are a series of yes-no questions, Doctor; okay?

"Answer:        [By Matthews] Yes.

"Question:        So part — so the first one we've talked about in the category A, those seven items [that are part of the diagnostic criteria for antisocial personality disorder], three of which have to be met, you saw a failure to conform to social norms with respect to lawful behavior, repeatedly performing acts that are grounds for arrest; is that right?

"Answer:        Yes.

"Question:        You also determined through your review of the records that the defendant lied repeatedly about his date of birth and name and has several aliases; is that right?

"Answer:        Yes."

The prosecution followed a similar pattern of eliciting yes-no answers when questioning Dr. Matthews about the sources of information upon which he relied. The inquiry confirmed that

the prosecution sent Matthews "35 three-inch binders full of documents," consisting of "16 to 17,000 pages of stuff." The prosecution then asked if "those documents included — and I'm going to talk generically here, all right — rehab records, police records, a wide variety of records like that, correct?" Matthews answered, "Yes," and conveyed no further information to the jury.

Against this backdrop, it is perhaps telling that defendant does not specifically identify the portions of Dr. Matthews's testimony he asserts conveyed inadmissible case specific hearsay. Instead, defendant essentially contends that three areas of Matthews's testimony constituted prejudicial error under *Sanchez*: Matthews improperly opined that defendant was not in a drug-induced delirium when he shot Officer Zeppetella; Matthews improperly opined that defendant had an antisocial personality disorder that accounted for defendant's behavior at the time of the crime; and Matthews emphasized that he based his opinions on a swath of documents beyond those considered by defense expert Dr. Stewart. Each of these points was independently supported by properly admitted evidence, such that either there was no *Sanchez* violation or that any violation was harmless even under *Chapman*'s "beyond a reasonable doubt" standard.[17]

---

[17] In his reply brief, defendant contends that "the only way" an expert may rely on case-specific hearsay that has been admitted through an appropriate witness is to " 'assume its truth *in a properly worded hypothetical question* in the traditional manner.' " Although we have approved of such an approach, we have not limited an expert's discussion to hypothetical questions. We stated in *Sanchez*, for example, that

First, Dr. Matthews opined that defendant was not in a drug-induced delirium when he shot Officer Tony Zeppetella. In reaching this conclusion, Matthews relied in part on the facts of the offense, stating, for example, that an individual suffering from delirium could not drive a car, provide relevant identification to a police officer during a traffic stop, reload a gun, drive to his mother-in-law's home, or hide evidence inside a vacuum cleaner bag because all of these steps required a presence of mind inconsistent with delirium. He opined, too, that defendant's "normal demeanor" when examined by health care workers immediately after the crime indicated defendant was not suffering from delirium because "[p]eople who are delirious would not know their surroundings and would not be able to answer questions intelligently and give a good medical history and behave cooperatively." Each of these facts was independently established in prior testimony; the facts themselves were not contested, and the jury was able to weigh Matthews's opinion (that the facts indicated defendant did not suffer from delirium) against Dr. Stewart's opinion (that the facts indicated defendant did suffer from delirium). Any *Sanchez* error that related to Matthews's description of these facts was not prejudicial.

Second, Dr. Matthews opined that defendant suffered from antisocial personality disorder, and that this disorder explained defendant's behavior at the time of the crime. Matthews based this diagnosis on defendant's "failure to

_____

a jury considers certain facts for their truth "[w]hen an expert is not testifying in the form of a proper hypothetical question *and no other evidence of the case-specific facts presented has or will be admitted . . . .*" (*Sanchez, supra*, 63 Cal.4th at p. 684, italics added.)

conform to societal norms with respect to lawful behaviors indicated by repeatedly performing acts that are grounds for arrest," that he "lied repeatedly about his date of birth and name," that he "showed irresponsible work behavior and had been unemployed for significant periods of time," and that he had been "using heroin and methamphetamine despite being made [aware] of their high risk of harmful consequences." Although defendant appears to object to the bases for Matthews's diagnosis as inadmissible case-specific hearsay, the diagnosis itself appears uncontested. Indeed, defendant's own expert, Dr. Ordas, also testified that defendant suffered from antisocial personality disorder. Further, each basis of Matthews's diagnosis was independently established by other admissible evidence introduced at trial, including testimony from defendant's wife, Dr. Ordas, Dr. Stewart, and the officers investigating the offense. Defendant's wife, for example, testified that she knew defendant had a drug problem "for a long time," that he used the alias "Roberto Vasquez," and that he was not working for "a couple of months" before killing Officer Zeppetella. Any *Sanchez* error related to Matthews having discussed that diagnosis was harmless given testimony by other witnesses.

Finally, defendant asserts Dr. Matthews bolstered his credibility by improperly referring to the documents and records on which he relied. We are not convinced that Matthews went further than simply "tell[ing] the jury *in general terms*" that he relied on hearsay in forming his opinion. (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) To the extent that he did, any error is harmless because, as discussed above, the basis for each of Matthews's opinions was independently established by other admissible evidence introduced at trial.

### b. *Officer Carnahan's testimony*

In addition to challenging Dr. Matthews's testimony, defendant contends Officer Carnahan's opinion that defendant possessed narcotics for sale was based on inadmissible hearsay — Detective Morgans's statement to Carnahan that he (Morgans) found a scale in defendant's car. Morgans had testified about the items he discovered in defendant's car (including a cell phone and syringes); he did not testify about having discovered a scale. As such, and as the Attorney General concedes, Carnahan's testimony regarding the scale was error under *Sanchez*.

The error was harmless, however. Defendant's sole argument related to prejudice is that the scale "was the key element of [Officer Carnahan's] conclusion that the drugs . . . were possessed for sale." This is not so. The scale was but one of many bases for Carnahan's conclusion. The other bases included items Carnahan personally seized from defendant's house, including the baggies and balloons used to package narcotics for sale, and the ammunition indicating defendant had armed himself for protection (a tactic Carnahan stated was common for those selling narcotics). Carnahan also stated that the cell phone and syringes found in defendant's car supported his opinion. Because Detective Morgans testified at trial to recovering these items, Carnahan could properly rely on the detective's testimony. (See, e.g., *Sanchez*, *supra*, 63 Cal.4th at p. 686.) Carnahan stated that the "totality of what was recovered" in defendant's home and car led to his opinion. This evidence was sufficient to support the officer's conclusion. (See, e.g., *People v. Newman* (1971) 5 Cal.3d 48, 53 [experienced officers may give their opinion that narcotics are held for purposes of sale based on matters including packaging,

73

quantity, and normal use of an individual], disapproved on another ground in *People v. Daniels* (1975) 14 Cal.3d 857, 862.) Additionally, Roybal, defendant's coworker, testified that defendant told Roybal he sold drugs, including heroin. The jury was therefore presented with evidence of narcotics sales, and testimony that defendant admitted he sold narcotics.

In light of these facts, we may conclude beyond a reasonable doubt that the error in admitting Officer Carnahan's statement regarding the scale did not contribute to the jury's verdict finding defendant guilty of possession of narcotics for sale.

### 6. *Cumulative effect of asserted errors*

Defendant argues that all of the alleged errors occurring at the guilt phase cumulated in his not "receiv[ing] a fair trial on the issue of his mental state at the time of the shooting" and urges us to reverse his convictions on this basis. We have found or assumed errors in three areas: those relating to the court's order that defendant submit to an examination by Dr. Matthews; the prosecutor's remarks regarding the ethics of forensic psychiatry; and the testimony implicating *Sanchez*, *supra*, 63 Cal.4th at page 665. We do not find these errors to be cumulatively prejudicial.

"Defendant was entitled to a fair trial but not a perfect one." (*Cunningham*, *supra*, 25 Cal.4th at p. 1009.) Because "[t]he few errors that occurred during defendant's trial were harmless, whether considered individually or collectively" (*ibid.*), we reject defendant's contention that his constitutional right to a fair trial was violated.

## B. Penalty Phase Issues

### 1. *Excusal of prospective juror*

#### a. *Background*

Over defendant's objection, the trial court excused Prospective Juror No. 70 for cause because of her views on the death penalty. Juror No. 70 had indicated in her questionnaire that she was "somewhat opposed" to the death penalty. When asked "[f]or what kinds of crimes, if any, do you believe the death penalty should be imposed," she wrote, "Perhaps, serial[] killers & serial rapists that are beyond any sort of redemption." The juror also gave responses indicating that although she was willing to consider evidence offered by defendant favoring life in prison, she was unwilling to consider evidence offered by the prosecution to persuade jurors to vote for the death penalty.

Both the defense and prosecution questioned the prospective juror regarding her position on the death penalty. During examination by defense counsel, Prospective Juror No. 70 stated, "I'm not necessarily in support of the death penalty. I think too many innocent people have been put to death. . . . If one person is put to death, that's too many for me." She also reiterated that "[i]t would be difficult for me to put somebody to death." In response to the question whether "in some cases you could see it [the death penalty] apply," she replied, "It would be difficult for me. I mean, it would have to be somebody like — it's hard — I know there's evil that exists in the world . . . but it would have to be, you know, a serial killer that . . . beyond any kind of reasonable doubt has committed horrible crimes, you know, violent crimes against people." Defense counsel reminded the prospective juror that on her questionnaire she had said the death penalty "was appropriate for serial killers and heinous

people who are unredeemable" and asked "so . . . you do see it [as] appropriate for some people." She responded: "Well, yeah. Like I said, I believe evil does exist in our world, but I think that's not a whole lot that would qualify as truly evil."

Defense counsel subsequently asked if Prospective Juror No. 70 was "open to hearing [aggravating] evidence." She responded, "Well, I'm open to hearing it. It would take an awful lot to convince me. I just can't . . . imagine myself condemning somebody to die." Counsel followed up with similar questions, and the prospective juror confirmed that she was "open to listening to both sides."

The prosecutor likewise probed the prospective juror about circumstances under which she could vote for the death penalty. Upon being asked, "if it's not a serial killer, . . . you can't really conceive of imposing the death penalty outside that," she answered: "I think the person themselves would have had to have given up on themselves too." The prosecutor queried if "realistically" there was a way for him to convince the prospective juror "that death would be a proper verdict in a case where there's no allegation there's more than one dead person." She replied, "It would be very difficult." She nonetheless clarified that she could not "be a hundred percent sure. I honestly — I mean, I could imagine coming across someone who is without any merit whatsoever and maybe deserves to die, but I don't know if it's this particular defendant." Prospective Juror No. 70 also agreed with the proposition that "participat[ing] in rendering a death verdict" "endorses the death penalty side of the system." The prospective juror did not think she would "want to do that" because her "general philosophy would sort of impair or prevent [her] from finding

death" as part of a "system of death penalty law that [she does not] think is fair."

The court held a sidebar conference with the attorneys, opening the discussion by stating, "I am inclined to excuse [Prospective] Juror[] 70 . . . for cause." When asked if she wished to be heard, defense counsel replied, "With regard to 70, I think it's — it's one of those borderline questions." Defense counsel emphasized that the prospective juror was "open to listening to see" if defendant was "the kind of defendant that would deserve the death penalty." She also disputed that "the only type of person [Prospective Juror No. 70] could describe that would fit that category [of somebody deserving of the ultimate punishment] is a serial killer," arguing that the prospective juror also included in that category "someone so evil and so unredeemable." The prosecutor interjected, contending the prospective juror's answers indicated that her feelings would "substantially impair [her] from reaching a verdict of death." The court agreed, stating, "she even went further. I have down a quote. Quote: I can't imagine condemning someone to die." The court elaborated that in its view, the juror was "saying hypothetically there may be one person out there — if Ted Bundy is in here, I may consider [the death penalty], but I really have such strong feelings, I can't imagine having to be in that position." The court thus concluded, "we're in a *Witt* situation" and granted the prosecution's challenge for cause.

### b. *Analysis*

Defendant asserts the court's excusal of Prospective Juror No. 70 violated his right to due process and an impartial jury guaranteed by the federal Constitution. We disagree.

"Under federal and state law, a prospective juror may be excluded for cause where his views on capital punishment would ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' " (*People v. DePriest* (2007) 42 Cal.4th 1, 20 (*DePriest*); see also *Wainwright v. Witt* (1985) 469 U.S. 412, 420, 424 (*Witt*).) Such a standard "does not require that a juror's bias be proved with 'unmistakable clarity.' " (*Witt, supra*, 469 U.S. at p. 424.) Indeed, "the question [to determine juror bias] is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record." (*Id.* at p. 434.) "[W]here answers given on voir dire are equivocal or conflicting, the trial court's assessment of the person's state of mind is generally binding on appeal." (*DePriest, supra*, 42 Cal.4th at p. 21.) "Accordingly, in such situations where the trial court has had an opportunity to observe the juror's demeanor, we uphold the court's decision to excuse the juror so long as it is supported by substantial evidence." (*People v. Spencer* (2018) 5 Cal.5th 642, 659 (*Spencer*).)

Substantial evidence supports the trial judge's decision to excuse Prospective Juror No. 70. As the court noted, the juror stated during voir dire that she "can't imagine myself condemning somebody to die." Furthermore, she repeatedly made clear that it would be "difficult" or "very difficult" for her to vote for the death penalty. (See *People v. Duenas* (2012) 55 Cal.4th 1, 12 ["Comments that a prospective juror would have a 'hard time' or find it 'very difficult' to vote for death reflect 'a degree of equivocation' that, considered 'with the juror's hesitancy, vocal inflection, and demeanor, can justify a trial court's conclusion . . . that the juror's views would " 'prevent or substantially impair the performance of his duties

as a juror . . . .' " ' [Citation.] On appeal, such a finding binds us"]; *People v. Poore* (2022) 13 Cal.5th 266, 296 [Although " 'it is true that a prospective juror is not disqualified merely because she would find it difficult to impose the death penalty' [citations], these panelists did not merely note the difficulty of reaching a penalty decision. They went on to question their actual ability to vote for death under any circumstances. 'When a prospective juror repeatedly says he does not know whether he could realistically impose the death penalty, we will not second-guess the trial court's determination that the juror is substantially impaired' "].) As indicia concerning how difficult it would be for her, the juror emphasized her feeling that "too many innocent people have been put to death" and "[if] one [such] person is put to death, that's too many for me." She followed by observing that she would not want to participate in rendering a death verdict because to do so would be to endorse a system of death penalty law that she believed to be unfair. Prospective Juror No. 70 also described in her questionnaire only a set of narrow circumstances not presented in this case — "serial[] killers & serial rapists that are beyond any sort of redemption" — as a situation in which she could "perhaps" view the death penalty as appropriate.

The prospective juror's written answers further bolster the inference that she could not consider evidence presented to support a verdict of death. In contrast to her unequivocal answer that she would take into account "evidence offered by the defendant favoring life in prison without the possibility of parole," the juror indicated that she could only "possibly" "consider and give weight to any evidence offered by the prosecution favoring the death penalty." She further elaborated that even if the "evidence is overwhelming" she could only

"maybe" consider it. Likewise, although the juror was clearly willing to "consider evidence the defendant introduces about his life and history in support of life in prison without the possibility of parole," she was decisively unwilling to consider "evidence the prosecution introduces about the defendant and his past to arrive at a verdict of death."

Under such circumstances, we conclude the trial court did not err in excusing Prospective Juror No. 70. (Accord, e.g., *Fuiava, supra,* 53 Cal.4th at pp. 660–661 ["the trial court could reasonably view Prospective Juror L.'s own statements that she could be fair in assessing guilt but not penalty, that she would have a 'real problem' voting for death, and her agreement that, although perhaps not impossible, it would be 'very unlikely' she ever would vote for death, as establishing that her ability to follow the law would be substantially impaired"]; *People v. Williams* (2013) 56 Cal.4th 165, 181 (*Williams*) [deferring to the trial court's ruling sustaining a challenge for cause when the prospective juror "repeatedly expressed extreme discomfort with the prospect of imposing the death penalty, telling the prosecutor at one point that even though he had voted for the death penalty, if personally called upon to carry it out, 'I'd have to pass' "]; *People v. Thomas* (2011) 51 Cal.4th 449, 471 [similar]; *Jones, supra,* 54 Cal.4th at p. 43 [similar]; *DePriest, supra,* 42 Cal.4th at p. 22 [similar]; *People v. Lancaster* (2007) 41 Cal.4th 50, 80 [upholding a trial court's dismissals when the prospective venirepersons "gave answers during voir dire indicating there was only a slim possibility they could vote for the death penalty, regardless of the state of the evidence"]; *Spencer, supra,* 5 Cal.5th at p. 661 [citing cases to support the proposition that it is not error to excuse members of the venire when their responses indicated that scenarios in which they

could vote for death did not reflect circumstances in the present trials]; *People v. Jones* (2017) 3 Cal.5th 583, 615 [similar]*; People v. Tully* (2012) 54 Cal.4th 952, 999–1000 (*Tully*) [similar].)

It is true that Prospective Juror No. 70 also gave answers that were somewhat more supportive of her ability to consider aggravating evidence and that arguably suggested she would not categorically exclude the possibility of imposing the death penalty in this case. But this is simply to say that the prospective juror's answers were equivocal. As discussed, "the proper inquiry in determining whether [*Witt*] error occurred is not whether some evidence exists that the prospective juror could vote for the death penalty." (*Spencer, supra,* 5 Cal.5th at pp. 660–661.) "The standard is instead whether substantial evidence exists to support the trial judge's determination that the juror was substantially impaired in terms of his [or her] ability to do so." (*Id.* at p. 661.) Here, the trial judge was "left with [such a] definite impression that a prospective juror would be unable to faithfully and impartially apply the law" that she was first to suggest that Prospective Juror No. 70 should be excused. (*Witt, supra,* 469 U.S. at p. 426.) Defense counsel, too, conceded that whether the juror was substantially impaired was a "borderline question." The most that could be said, therefore, is that the prospective juror was ambivalent in her responses. Such equivocation "requires that we defer to the trial court's assessment of her initial and ultimate state of mind." (*Jones, supra,* 54 Cal.4th at p. 43.) In light of such deference, we conclude the trial court did not err in excusing the prospective juror.

## 2. Rulings on scope of cross-examination

### a. Background

Before the penalty phase began, the trial court held a hearing to discuss evidence the parties intended to introduce. (See Evid. Code, § 402, subd. (b).) The defense indicated that it planned to call defendant's mother, sister, grandfather, and wife. The defense made the following offer of proof regarding these witnesses.

With respect to defendant's mother, Diana Gil, defense counsel stated that the intention was for Gil "to say where and how [defendant] grew up and that she's his mother, and she loves him." Upon hearing this offer of proof, the prosecutor referenced defendant's juvenile record and remarked, "[u]ntil now we have . . . sanitized this case from that, but depending on what she says . . . [t]he door opens . . . and I get to start talking to her about what happened as he was growing up." The trial court agreed, indicating that if Gil "start[s] talking about what a good child he was . . . that's going to open the door to a lot of this information coming in about his criminal record." Defense counsel responded, "I agree if we try to paint a picture that he was a good boy, then bad boy comes in." Counsel emphasized that the defense would not present defendant as "a good student, . . . a good child," and "well behaved, because we recognize that would open doors." Instead, defense counsel asserted, his mother's testimony would simply "paint a picture of this is a mother who's going to be affected and . . . regardless of what [jurors] know about her son, she loves him." Counsel also stated that a photograph of defendant at age 15 would be introduced through Gil's testimony. The court indicated it would allow the photograph and that neither the photograph nor Gil's testimony,

as proffered, would subject the witness to cross-examination about defendant's juvenile record.

Defense counsel next discussed the anticipated testimony of defendant's sister, Tatiana. The offer of proof concerning that testimony, counsel explained, "is that she loves him and that she's his little sister and where she fits in the family. Rather brief." The court ruled that it would allow Tatiana to testify, finding her testimony not to be cumulative. It further clarified that if Tatiana "wants to say in general he's my brother and I love him, then it would not open the door" to rebuttal evidence. However, if Tatiana testified to "details [about] what a wonderful person [defendant has] been, character evidence about things he's done for the family, for example, through his life . . . that would open the door to impeachment with this information that we have discussed." Defense counsel responded, "Thank you."

Defense counsel continued the discussion with an offer of proof concerning the testimony of defendant's grandfather, Jose Gil Torres. According to counsel, Torres would "draw [a] picture" for the jury that defendant and his brother grew up with their grandfather on a ranch before they began school and that Torres "knew him then and has stayed in his life ever since" and still "loves [defendant] today." The court remarked that Torres's proffered testimony "doesn't sound cumulative . . . and I would allow it with the caveat about opening doors." The prosecutor clarified that if Torres "says he was a good kid and always a good kid around the ranch and a hard worker, then it seems . . . the door is opened." The court responded, "Okay."

Turning to the anticipated testimony of defendant's wife, Stacey Camacho, the parties first focused on the number of

photographs that would be introduced through her narrative. The defense stated that it intended to present four pictures of defendant on construction sites and 25 pictures of defendant and his wife and two children. The prosecutor objected to the latter group, contending that they were cumulative. The court agreed, and after some back and forth, the defense settled on nine pictures of defendant's family. The defense was thus permitted to introduce 14 photographs in total: one of defendant at age 15, four of defendant at his work, and nine of defendant with his wife and children.

The prosecutor contended that the introduction of the nine photographs of defendant with his family constituted indirect evidence that defendant was a "good father and a good husband." The prosecutor asked that he be allowed to respond to those photographs with letters defendant wrote to women who were not his wife while he was held in pretrial detention, the content of which was "sexually explicit." The court said that based on a weighing under Evidence Code section 352 it would not allow such impeachment. However, "[i]f the witnesses were going to say he's a wonderful husband, he's a great father, he's attentive — if they're going to give character opinions . . . all that would open the door."[18] The prosecutor inquired if the court would consider revisiting its ruling if "Stacey Camacho takes the stand and doesn't . . . use the word[] 'good,' but starts to describe

***

[18] The court had also summarized the scope of permissible impeachment evidence, indicating that such evidence included, among other things, "the horrendous facts of the present case, the four prior felony convictions, [defendant's] drug dealing," "long-term drug abuse," "having the drugs in the home" and possibly any prior statements of the witnesses that contradict their anticipated testimony.

what could only be concluded as she's saying he's good." The court indicated its willingness to do so, stating "none of these rulings are etched in stone."

At trial, the defense elected not to call defendant's sister or grandfather to the stand. It did introduce the testimony of defendant's mother and wife, both of whom testified consistently with the offers of proof.

### b. *Analysis*

Despite having agreed with the trial court's in limine rulings and presenting testimony in conformity with the offers of proof, defendant now claims that the court erred in deciding that, if the witnesses testified generally concerning defendant's good character, the prosecutor would be entitled to rebut with evidence of defendant's juvenile record, gang activities, or other discreditable conduct. Defendant is mistaken.

As an initial matter, the claim is not preserved for appeal. (See, e.g., Evid. Code, § 353; *Tully*, *supra*, 54 Cal.4th at p. 1010.) Before the court made any rulings, defendant outlined the anticipated testimony, and the witnesses who testified at trial gave accounts that were consistent with the offers of proof. Although two of the potential witnesses, defendant's sister and grandfather, did not ultimately take the stand, there is no indication that they forwent the opportunity because of the trial court's preliminary rulings. Moreover, when the court indicated that if defendant's mother testified concerning what a "good child" defendant had been, she may be confronted with his juvenile record, defense counsel fully concurred, stating "I agree if we try to paint a picture that he was a good boy, then bad boy comes in." Counsel likewise made no objection when the trial court sketched the circumstances under which the witnesses'

testimony may "open the door" to cross-examination. In addition, even though the court told the parties that its rulings were preliminary and could be revisited when the witnesses testified, defendant made no effort to expand the scope of testimony at trial. Given his conduct below, defendant has waived his claim.

In any event, defendant's argument is without merit. "When a defendant places his character at issue during the penalty phase of a capital trial, the prosecution may respond by introducing character evidence to undermine the defendant's claim that his good character weighs in favor of mercy and to present a more balanced picture of the defendant's personality." (*Valdez, supra,* 55 Cal.4th at pp. 169–170.) "As in other cases, the scope of rebuttal must be specific, and evidence presented or argued as rebuttal must relate directly to a particular incident or character trait defendant offers in his own behalf." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 792, fn. 24.) When a defendant's "good character evidence [is] not limited to any singular incident, personality trait, or aspect of his background," rebuttal evidence may likewise be tailored to the "breadth and generality of [the] good character evidence." (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1072 (*Mitcham*).) "The trial court has broad discretion to determine the admissibility of rebuttal evidence and, absent palpable abuse, an appellate court may not disturb the trial court's exercise of that discretion." (*Valdez, supra,* 55 Cal.4th at p. 170.)

In this case, the court specified that if members of defendant's family testified that he was a "good child," "a wonderful person," "always a good kid," "wonderful husband," or "great father," then the prosecution would be allowed to confront the witnesses with evidence of defendant's misconduct. Such

rebuttal evidence included not only information already in the record — e.g., "the horrendous facts of the present case, the four prior felony convictions, [defendant's] drug dealing," "long-term drug abuse," "having the drugs in the home" — but also information previously excluded from consideration by the jury, e.g., defendant's juvenile record and his gang affiliation.[19]

Such a ruling is in line with our precedent and within the trial court's discretion. (Accord, e.g., *People v. Carter* (2003) 30 Cal.4th 1166, 1204 (*Carter*) [the prosecution was entitled to rebut testimony that "as a child, defendant did not cause problems at the boys and girls club and wanted to stay in school and make his mother proud of him" with evidence of defendant's juvenile adjudications and confinements]; *People v. Fierro* (1991) 1 Cal.4th 173, 238 (*Fierro*) ["The witness had testified generally to defendant's good character and offered specific examples of his socially useful activities . . . . Membership in youth gangs was relevant to the issue of defendant's character and activities as a youth and specifically rebutted the direct testimony of the witness"]; *id.* at p. 239 [concluding that the defendant "was not entitled to elicit testimony that he was a

---

[19]    With regard to some of the proposed testimony (e.g., that of defendant's sister and grandfather), the trial court stated that it had the potential to "open doors," but did not specify what impeaching evidence would be admissible. We do not take the trial court's comments to mean that all possible rebuttal evidence would be admitted should the witnesses "open doors." Rather, the court spoke in general terms, which was understandable given that the rulings were tentative and the witnesses had yet to take the stand. In any event, we reiterate that proper rebuttal evidence must be tailored to the "breadth and generality of [the] good character evidence." (*Mitcham, supra,* 1 Cal.4th at p. 1072.)

'respectful' youth who 'would never hurt anybody,' and preclude cross-examination as to whether the witness was aware of conduct by the defendant inconsistent with the witness's testimony," including his trouble with law enforcement while growing up]; *Mitcham, supra,* 1 Cal.4th at pp. 1071–1072 [similar]; *People v. Clair* (1992) 2 Cal.4th 629, 684–685 [finding no error when a witness " 'express[ed] an opinion as to the good character of the defendant' [citation], viz., that he was 'compassionate, warm and considerate of other people' " and the prosecution was permitted to ask if the witness knew the defendant "had been charged with rape and forcible oral copulation"].)

Insofar as defendant claims the trial court erred by limiting the number of pictures the court permitted to be introduced via Stacey's testimony, we discern no abuse in the court's ruling. It is clear that the trial court conscientiously examined the proffered evidence and used its judgment in reasonably reducing the number of photographs to avoid cumulation. (Accord *People v. Virgil* (2011) 51 Cal.4th 1210, 1273 ["It was within the trial court's discretion to limit the number of photographs" of the defendant's child to five].)

Because the trial court did not abuse its discretion in articulating the scope of rebuttal, defendant's constitutional gloss on the same argument, "to the extent it is preserved for appeal, also is without merit." (*Fuiava, supra,* 53 Cal.4th at p. 670.)

### 3. *Instruction on sympathy for defendant's family*
#### a. *Background*

At the conclusion of the penalty phase, the trial judge instructed the jury with, inter alia, CALJIC No. 8.85.

In relevant part, the instruction read as follows: "Sympathy for the family of the defendant is not a matter that you can consider in mitigation. Evidence, if any, of the impact of an execution on family members should be disregarded unless it illuminates some positive quality of the defendant's background or character."

### b. Analysis

Defendant argues the trial court's giving CALJIC No. 8.85 violated his constitutional rights by precluding the jury from being swayed by sympathy for his family. Our case law is to the contrary.

In *People v. Ochoa* (1998) 19 Cal.4th 353 (*Ochoa*), we addressed whether capital juries may consider sympathy for a defendant's family in determining the appropriate sentence. We began by noting the unsettled state of the law on the issue, which had not been decided previously. (*Id.* at p. 455.) We reasoned that capital juries are required to engage in "an individualized assessment of the defendant's background, record, and character, and the nature of the crimes committed, both as a matter of state law [citations] and as a federal constitutional requirement [citations]." (*Id.* at p. 456.) As such, in the context of a capital sentence determination, "what is ultimately relevant is a defendant's background and character — not the distress of his or her family." (*Ibid.*) We therefore held that "sympathy for a defendant's family is not a matter that a capital jury can consider in mitigation, but that family members may offer testimony of the impact of an execution on them if by so doing they illuminate some positive quality of the defendant's background or character." (*Ibid.*) As

defendant concedes, this language from *Ochoa* serves as the basis for the portion of CALJIC No. 8.85 that he now challenges.

As defendant must also concede, our court's adherence to *Ochoa* has been unwavering.  (See, e.g., *People v. Rices* (2017) 4 Cal.5th 49, 89 (*Rices*) ["Defendant contends that *Ochoa*, *supra*, 19 Cal.4th 353, was wrongly decided.  We have rejected substantially similar arguments and continue to do so"]; *Williams*, *supra*, 56 Cal.4th at p. 197 ["Defendant contends this aspect of the standard instruction [of CALJIC No. 8.85] violated California's death penalty statute and his rights under the Eighth Amendment.  Established precedent is to the contrary"]; *Tully*, *supra*, 54 Cal.4th at pp. 1047–1048; *People v. Livingston* (2012) 53 Cal.4th 1145, 1178–1179 (*Livingston*); *Fuiava*, *supra*, 53 Cal.4th at pp. 723–724; *People v. Bennett* (2009) 45 Cal.4th 577, 602 (*Bennett*); *People v. Romero* (2008) 44 Cal.4th 386, 425; *People v. Vieira* (2005) 35 Cal.4th 264, 294–295 (*Vieira*); *Carter*, *supra*, 30 Cal.4th at p. 1205; *Bemore*, *supra*, 22 Cal.4th at p. 856; *People v. Smithey* (1999) 20 Cal.4th 936, 1000–1001.)

Still, defendant contends that *Ochoa* must be reconsidered in light of *Cullen v. Pinholster* (2011) 563 U.S. 170 (*Pinholster*).  Defendant ignores the fact that many of our cases affirming *Ochoa* postdate *Pinholster*.  (See, e.g., *Rices*, *supra*, 4 Cal.5th at pp. 88–89; *Williams*, *supra*, 56 Cal.4th at pp. 197–198; *Tully*, *supra*, 54 Cal.4th at pp. 1047–1048; *Livingston*, *supra*, 53 Cal.4th at pp. 1178–1179; *Fuiava*, *supra*, 53 Cal.4th at pp. 723–724.)  This is for good reason, because nothing the high court said in *Pinholster* compels us to reject *Ochoa*.

In *Pinholster*, the court examined an ineffective assistance of counsel claim brought in a habeas corpus petition.  (*Pinholster*, *supra*, 563 U.S. at p. 174.)  The petitioner's trial had

taken place in Los Angeles in 1984.  (See *id.* at pp. 176, 196.)
During the penalty phase, the defense called only his mother,
Burnice Brashear.  (*Id.* at p. 177.)  Brashear testified to the
petitioner's difficult childhood and highlighted positive aspects
of her son's character.  (*Ibid.*)  In concluding that the petitioner's
counsel did not perform deficiently by presenting only
Brashear's testimony, the court reasoned that because the
petitioner was "an unsympathetic client," "it would have been a
reasonable penalty-phase strategy to focus on evoking sympathy
for [his] mother," the so-called "family-sympathy defense."  (*Id.*
at p. 193.)  The court also said that there was "no evidence . . .
that [a family-sympathy mitigation defense] would have been
inconsistent with the standard of professional competence in
capital cases that prevailed in Los Angeles in 1984" and indeed,
"at the time, the defense bar in California had been using that
strategy."  (*Id.* at p. 196; see also *id.* at p. 232, fn. 21 (dis. opn. of
Sotomayor, J.) ["I do not doubt that a decision to present a
family-sympathy mitigation defense might be consistent 'with
the standard of professional competence in capital cases that
prevailed in Los Angeles in 1984' in some cases"]; *Pinholster v.
Ayers* (9th Cir. 2009) 590 F.3d 651, 707 (dis. opn. of Kozinski, J.)
["The main point of Burnice's testimony was to create sympathy
for herself and the other members of [the petitioner's] family in
the hope that the jury would take pity on *them* and spare them
the agony of losing a son and brother to the executioner.  That's
what's known as the 'family sympathy' mitigation defense and
other lawyers in California used it at the time"].)

Defendant argues that although the *Pinholster* court did
not say so "in so many words," the case must be read to mean
that "sympathy for the family of the accused is a factor in
mitigation that a jury *must be* allowed to consider . . . [under]

the ambit of the Eighth Amendment's guarantee of a reliable penalty determination." That is, not only is sympathy for the defendant's family a permissible consideration for a capital jury, but it is constitutionally prohibited for the state to preclude a jury from taking such sympathy into account.

*Pinholster* cannot be fairly read to establish such a constitutional mandate. We agree with the People that, for our present purposes, all *Pinholster* does is indicate that a family-sympathy defense was a viable strategy in California in 1984 when *that* "capital trial took place." This is hardly surprising. When we decided *Ochoa* in 1998, we noted that up until that point, the law was unsettled regarding " 'whether the jury may consider evidence of the impact a judgment of death would have upon the defendant's family.' " (*Ochoa, supra*, 19 Cal.4th at p. 455; see also, e.g., *In re Visciotti* (1996) 14 Cal.4th 325, 337, fn. 3 [observing that this "court has not considered whether family sympathy is within any statutory factor (§ 190.3) or an aspect of the defendant's character or record which the jury must be allowed to consider" but finding no occasion to undertake such an examination]; *Fierro, supra*, 1 Cal.4th at p. 241 [assuming but not deciding that "[a] defendant has a right to introduce evidence of the effect of a death sentence on his family"]; *People v. Cooper* (1991) 53 Cal.3d 771, 844, fn. 14 ["We need not now decide whether evidence of the impact on the defendant's family comes within this 'broad' range of constitutionally pertinent mitigation"].)

We "resolve[d] the point" of ambiguity in *Ochoa*. (*Ochoa, supra*, 19 Cal.4th at p. 455.) Accordingly, the law now — and at defendant's trial — is that "execution-impact evidence is irrelevant under section 190.3 because it does not concern a defendant's *own circumstances* but rather asks the jury to spare

defendant's life based on the effect his or her execution would have on his or her family" and "nothing in the federal Constitution requires a different result." (*Bennett, supra,* 45 Cal.4th at p. 602.) The trial court thus did not err in instructing the jury that it should not consider sympathy for defendant's family as a mitigating factor in itself.

Besides reliance on *Pinholster*, defendant makes various arguments essentially asserting that *Ochoa* was wrong at its inception. Defendant "identifies no reason to reconsider our conclusion." (*Bennett, supra,* 45 Cal.4th at p. 602.) Nothing in the authorities that defendant cites establishes that sympathy for a defendant's family — when unilluminating of "any [positive] aspect of a defendant's character or record and any of the circumstances of the offense" (*Lockett v. Ohio* (1978) 438 U.S. 586, 604) — is a mitigating factor a capital jury is permitted to consider under California law and is required to consider (when proffered) under federal constitutional principles. Consistent with the principle of stare decisis, we continue to adhere to *Ochoa* and its line of cases. (See, e.g., *Bourhis v. Lord* (2013) 56 Cal.4th 320, 327.)

Finally, defendant makes an equal protection argument, asserting that because criminals seeking to obtain probation instead of prison can present evidence of the impact on their families (Cal. Rules of Court, rule 4.414(b)(5)), death eligible defendants should be able to present family sympathy evidence. Defendant has provided no authority to support the proposition that capital and probation-eligible defendants are similarly situated such that the former are constitutionally entitled to introduce certain evidence simply because the latter may do so. Indeed, in rejecting a prior challenge to CALJIC No. 8.85, we held that reliance on "family considerations in probation

determinations is not on point." (*Williams*, *supra*, 56 Cal.4th at p. 197.) We explained that was so because section 190.3, and our subsequent interpretation thereof — and not the probation statutes — control the scope of matters relevant to " 'aggravation, mitigation, and sentence.' " (*Williams*, *supra*, 56 Cal.4th at p. 197; see also *Bennett*, *supra*, 45 Cal.4th at p. 602 [stating that the probation statute has "no bearing upon this court's construction of section 190.3"].) Defendant attempts to circumvent our precedent by stressing that we did not previously consider California Rules of Court, rule 4.414. But we do not see how the logic of our case law is undermined by the rule of court, nor any indication that the rule itself could give rise to a constitutional claim.

More directly, we do not agree with defendant's contention that "there is no rational distinction to be made that supports allowing a judge to consider the impact of imprisonment on [a probation-eligible] defendant's family while enjoining the jury from taking into account the impact of a defendant's execution on his family." Probation is an act of clemency for which individuals convicted of serious crimes are categorically ineligible. (See § 1203, subd. (k) ["Probation shall not be granted to . . . any person who is convicted of a violent felony . . . or a serious felony"]; see also *id.*, subd. (e).) There are plausible reasons why the Legislature might want to allow consideration of how a would-be prisoner could positively impact his or her family if put on probation but not allow consideration of sympathy evidence — when unconnected to any "positive quality of the defendant's background or character" (*Ochoa*, *supra*, 19 Cal.4th at p. 456) — to influence a decision between a sentence of death and life without the possibility of parole.

In short, defendant has not persuaded us that he was denied equal protection under the law because, unlike, probation-eligible defendants, the jury could not take sympathy for his family into consideration when deciding his sentence.

### 4. *Omission of instruction on remorse*

#### a. *Background*

Before the penalty phase began, defendant submitted a proposed instruction concerning the role of remorse. The instruction read, "Remorse, which by definition can only be experienced after a crime's commission, is something commonly thought to mitigate aspects of the crime and defendant's culpability. [¶] You may consider defendant's remorse for his actions as a factor in mitigation." The prosecutor objected to the instruction as being "subsumed under factor k" of section 190.3, and the court rejected the defense's proposal. The court, however, left open the possibility that if the jury asked about being able to consider remorse, it would "perhaps give something along the lines of what you're requesting."

The court instructed the jury with CALJIC No. 8.85. In relevant part, the instruction stated, "In determining which penalty is to be imposed . . . [y]ou shall consider, take into account and be guided by the following factors . . . : (k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (See also § 190.3.)

Both the defense and prosecution highlighted defendant's remorse — or the lack thereof — in their closing statements.

Defense counsel informed the jury remorse was a proper consideration under factor (k) of the relevant instruction. Counsel then summarized the evidence that, counsel believed, showed defendant experienced remorse after shooting the victim.

The prosecution likewise acknowledged that remorse was a mitigating factor that the jury may consider under factor (k). The prosecution, however, argued that defendant displayed no remorse. The prosecution urged the jury to find that the mitigating factors, including any "so-called . . . remorse," were substantially outweighed by the aggravating factors.

### b. Analysis

Contrary to defendant's claim, we find no error in the trial court's refusal to give the proposed instruction on remorse. "It is settled that CALJIC No. 8.85 properly instructs the jury on aggravating and mitigating factors, and the court need not give pinpoint instructions on mitigation." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1297.) Moreover, although a defendant is entitled, upon request, "to an instruction that pinpoints the *theory* of the defense," he has no right to "an argumentative instruction" or "an instruction 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.'" (*People v. Mincey* (1992) 2 Cal.4th 408, 437.) The proposed instruction at issue here invited the jury to "consider defendant's remorse for his actions as a factor in mitigation." Such an instruction is argumentative — not least because it presupposed that defendant experienced remorse, when whether defendant did so was a disputed factual issue, as highlighted by the opposing parties' closing statements. (See *People v. San Nicolas* (2004) 34 Cal.4th 614,

673 & fn. 16 (*San Nicolas*) ["a pinpoint instruction" telling the jury it may consider " '[w]hether or not the defendant expressed remorse or shame for his crime' " " 'properly belongs not in instructions, but in the arguments of counsel to the jury' "].)

In addition, the trial court instructed the jury with CALJIC No. 8.85, the relevant portion of which allowed the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime . . . , and any sympathetic or other aspect of the defendant's character or record." (CALJIC No. 8.85.) "This court has interpreted section 190.3 factor (k), which CALJIC No. 8.85, factor (k) incorporates, as ' "allow[ing] the jury to consider a virtually unlimited range of mitigating circumstances." ' " (*San Nicolas*, *supra*, 34 Cal.4th at pp. 673–674.) As both parties acknowledged in front of the jury, remorse is subsumed under factor (k) of CALJIC No. 8.85, meaning that the jury may consider it in deliberations as a potential mitigating circumstance. Because "factor (k) is adequate for informing the jury that it may take account of any extenuating circumstance," "there is no need to further instruct the jury on specific mitigating circumstances." (*Vieira*, *supra*, 35 Cal.4th at pp. 299–300.) "It is generally the task of defense counsel in its closing argument, rather than the trial court in its instructions, to make clear to the jury which penalty phase evidence or circumstances should be considered extenuating under factor (k)." (*Id.* at p. 300.)

Defendant contends there was "no issue concerning the accuracy of the proposed defense instruction" and suggests that it was not argumentative nor duplicative. He asserts that "[n]either the prosecutor nor the trial court voiced any concern with the instruction as a whole or any of the wording" and "[i]n fact, the trial court indicated that it would use the instruction if

the jurors had a question about remorse." Defendant's contention is belied by the record. Both the prosecutor and the court took exception with the proposed instruction, finding it unnecessary in light of CALJIC No. 8.85. Furthermore, the court never said "it would use the instruction" defendant proposed. Instead, it merely suggested that the court would "perhaps give something along the lines of what [the defense was] requesting" should certain circumstances arise. Such a qualified statement lends no support to defendant's argument.

### 5. *Exclusion of testimony concerning conditions of confinement for a prisoner serving a sentence of life without the possibility of parole*

#### a. *Background*

Outside the presence of the jury, the defense indicated it planned to call an "expert with regard to prison conditions." According to the defense, the expert would testify "just generally as to the custodial situation for a person doing life without the possibility of parole." The court excluded the proposed testimony on the ground that a defense expert "may not render . . . testimony on general LWOP conditions in the prison system."

Although excluding testimony on the subject, the court confirmed that defense counsel was entitled to argue "what prison conditions [would] look like for somebody who's going to get a sentence" of life without the possibility of parole. Counsel in fact so argued to the jury during closing remarks.

#### b. *Analysis*

As defendant acknowledges, our case law rejects the notion that he had a statutory or constitutional right to present in his case-in-chief evidence regarding conditions of confinement

for a defendant sentenced to life in prison without the possibility of parole. (See, e.g., *Eubanks, supra,* 53 Cal.4th at p. 149 [" 'evidence of the conditions of confinement that a defendant will experience if sentenced to life imprisonment without parole is irrelevant to the jury's penalty determination because it does not relate to the defendant's character, culpability, or the circumstances of the offense. [Citations.] Its admission is not required either by the federal Constitution or by Penal Code section 190.3' "]; *People v. Ervine* (2009) 47 Cal.4th 745, 794– 795; *People v. Ledesma* (2006) 39 Cal.4th 641, 735; *People v. Smith* (2005) 35 Cal.4th 334, 365–366; *People v. Coddington* (2000) 23 Cal.4th 529, 636; *People v. Majors* (1998) 18 Cal.4th 385, 415–416; *People v. Quartermain* (1997) 16 Cal.4th 600, 632; *People v. Fudge* (1994) 7 Cal.4th 1075, 1117; *People v. Thompson* (1988) 45 Cal.3d 86, 138–139; cf. *People v. Smith* (2015) 61 Cal.4th 18, 58 ["the defense may not introduce such evidence [regarding prison conditions] as a factor *in mitigation.* The defense may, however, respond to aggravating evidence suggesting the defendant will be dangerous in prison"].)

Defendant insists that we should reconsider but offers no persuasive reason for us to do so. Although "defendant might have an interest in telling the jurors of . . . the rigors of confinement in order to impress upon them the gravity of their responsibility, that interest could be satisfied in his argument." (*People v. Daniels* (1991) 52 Cal.3d 815, 877–878.)

### 6. *Cumulative effect of asserted errors*

Because we have found no error in the penalty phase of defendant's trial, we reject defendant's claim that his sentence of death must be reversed due to the cumulative effect of the purported errors discussed above.

### 7. *Constitutionality of California death penalty law*

Defendant raises familiar arguments contending that California's death penalty scheme is unconstitutional. He has given us no reason to revisit our precedents holding to the contrary. We therefore continue to hold as follows.

"California's death penalty laws adequately narrow the class of murderers subject to the death penalty. [Citation.] In particular, the special circumstances of section 190.2, which render a murderer eligible for the death penalty, are not so numerous and broadly interpreted that they fail adequately to narrow the class of persons eligible for death." (*Navarro*, *supra*, 12 Cal.5th at p. 345.)

"Section 190.3, factor (a), directs the jury to consider as evidence in aggravation the circumstances of the capital crime. This has not resulted in the wanton imposition of the death penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments by permitting prosecutors to argue that the various features of the murder, even features that are the converse of those in other cases, are aggravating factors." (*People v. Schultz* (2020) 10 Cal.5th 623, 683 (*Schultz*).)

" 'The language " 'so substantial' " . . . ' in CALJIC No. 8.88 'is not impermissibly vague.' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 327.)

"Use of adjectives such as 'extreme' and 'substantial' in section 190.3, factors (d) and (g), respectively, does not create a constitutionally impermissible barrier to the jury's consideration of a defendant's mitigating evidence." (*People v. Johnson* (2016) 62 Cal.4th 600, 656.)

"The court's instructions regarding the various aggravating and mitigating factors did not act as a barrier to the

jury's consideration of defendant's mitigating evidence or infringe defendant's constitutional rights." (*Schultz, supra,* 10 Cal.5th at p. 684.) In particular, the court is not required to "identify which factors are aggravating and which are mitigating. [Citation.] Directing the jury to consider ' "whether or not" ' certain mitigating factors were present does not invite the jury to use the absence of such factors as a factor in aggravation." (*Ibid.*)

Contrary to defendant's suggestion, there is no constitutional mandate that the jury be instructed to "find beyond a reasonable doubt that the aggravating factors in this case outweighed the mitigating factors" or that "aggravating factors other than prior criminality [must be] proven beyond a reasonable doubt." (See *People v. McDaniel* (2021) 12 Cal.5th 97, 155.)

"[T]he federal Constitution does not require that the jury agree unanimously on which aggravating factors apply." (*Navarro, supra,* 12 Cal.5th at p. 345.)

"Neither the federal Constitution nor state law requires the jury be instructed that the prosecution bears some burden of proof as to the truth of the aggravating factors (other than factor (b) or (c) evidence) or the appropriateness of a death verdict." (*Schultz, supra,* 10 Cal.5th at p. 683.)

The trial court need not instruct the jury that "it must return a sentence of life without the possibility of parole if it finds that mitigation outweighs aggravation." (*People v. Johnson* (2019) 8 Cal.5th 475, 528.)

"The penalty phase jury is not required to make written findings regarding its penalty choice, and the absence of such

written findings does not preclude meaningful appellate review." (*Schultz, supra*, 10 Cal.5th at p. 684.)

"Contrary to defendant's assertion, there is no Eighth Amendment requirement that California's death penalty scheme provide for intercase proportionality review, either in the trial court or on review." (*People v. Johnson, supra*, 62 Cal.4th at p. 656.)

"California does not regularly use the death penalty as a form of punishment, and ' "its imposition does not violate international norms of decency or the Eighth Amendment's prohibition against cruel and unusual punishment." ' " (*Navarro, supra*, 12 Cal.5th at p. 346.)

"Defendant acknowledges that this court has previously rejected each of the challenges to California's death penalty scheme that he presents here. He asserts, however, that our analysis of these issues is constitutionally defective because we have failed to consider their cumulative impact or to address the capital sentencing scheme as a whole. This court has considered and rejected identical arguments before, and we do so again here." (*Schultz, supra*, 10 Cal.5th at p. 685.)

### III.  DISPOSITION

Because defendant has not demonstrated reversible error, we affirm the judgment in its entirety.


**CANTIL-SAKAUYE, C. J.**



**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**GUERRERO, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Camacho

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S141080
**Date Filed:**  November 28, 2022

_____

**Court:**  Superior
**County:**  San Diego
**Judge:**  Joan P. Weber

_____

**Counsel:**

Barry Morris, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Dane R. Gillette and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland and James William Bilderback II, Assistant Attorneys General, Holly D. Wilkens, Heather F. Crawford and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Barry Morris
Attorney at Law
1407 Oakland Boulevard, #200
Walnut Creek, CA 94596
(925) 934-1100

Robin Urbanski
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9115